# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **BRADISH JOHNSON CO., LIMITED, individually and as representative of all those similarly situated** | **CIVIL ACTION NO. 2:23-CV-07363** |
| | **SECTION "J"(4)** |
| **VS.** | |
| | **JUDGE CARL J. BARBIER** |
| **TENNESSEE GAS PIPELINE COMPANY, LLC, and KINETICA ENERGY EXPRESS, LLC** | **MAGISTRATE KAREN WELLS ROBY** |

## FIRST AMENDED CLASS ACTION COMPLAINT

Pursuant to Fed. R. Civ. P. 15(a)(1)(B), Plaintiff, Bradish Johnson Co., Limited, individually and as representative of all those similarly situated, hereby files this First Amended Class Action Complaint against Defendants Tennessee Gas Pipeline Company, L.L.C., and Kinetica Energy Express, LLC (collectively, "the Pipeline Defendants"). This Amended Complaint deletes the one claim from the original Class Action Petition that had been asserted as an individual claim by Bradish Johnson, its claim for violation of the Louisiana Unfair Trade Practices Act ("LUTPA"). Bradish Johnson has also replaced references to the class action procedure under La. C.C.P. art. 591, *et seq.* with references to the federal class action procedure under Fed. R. Civ. P. 23. The Pipeline Defendants filed Rule 12(b)(6) motions on January 24 and January 25, 2024, so this Amended Class Action Petition is within the 21-day period for amendment under Fed. R. Civ. P. 15(a)(1)(B).[1]

---

[1] Should Bradish Johnson later determine to pursue a LUTPA claim, it will only do so if leave of court is granted pursuant to Fed. R. Civ. P. 15(a)(2).

Bradish Johnson brings claims on behalf of itself and a proposed class of other Louisiana landowners across whose property the Pipeline Defendants dredged flotation canals, for the Pipeline Defendants' breach of their obligations under Louisiana law that applies to the flotation canals for the pipelines that traverse Bradish Johnson's property and go on to traverse the properties of the other proposed class members. The Pipeline Defendants, after they dredged these canals, had an unmistakable duty under Louisiana law to "cause the least possible damage to" the landowners' property and exercise their rights in a "way least inconvenient to the" landowners' property. The Pipeline Defendants knew that if they did not take steps to protect the landowners' property, then that property would be destroyed; moreover, the Pipeline Defendants knew what those steps were—including but not limited to the construction and maintenance of protective structures such as dams, plugs, and bulkheads—but the Pipeline Defendants negligently maintained those structures and the canal banks because doing so properly was too expensive. The Pipeline Defendants ignored their duty to prevent their use of landowners' property from unduly burdening and destroying that property. The Pipeline Defendants cannot be exonerated from these duties under Louisiana law because to do so would violate public policy, as manifested in Louisiana's constitutional public trust doctrine and recognized by the Louisiana Supreme Court in its 2004 *Avenal* decision. Just as unmistakable as the existence of the duty is the Pipeline Defendants' wholesale breach of that duty. As seen in the Pipeline Defendants' own commissioned and coordinated report in 1972, the Battelle Report, they knew from the beginning how to properly maintain the canals to protect the landowners' property from eroding and what would happen if they engaged in negligent maintenance instead. Exactly what they knew would happen, happened: the land of Louisiana landowners was destroyed. The Pipeline Defendants have violated their obligations under the Louisiana Civil Code as applied to their right-of-way agreements and

expropriation judgments, acted negligently, committed a nuisance under the law, abused their rights, and trespassed on landowners' property rights, as alleged and claimed as follows:

**PARTIES**

### *Named Representative Plaintiff*

1. Plaintiff, Bradish Johnson Co., Limited, is a Louisiana corporation with its principal place of business in Orleans Parish, Louisiana, and that owns property affected by the conduct alleged by the Defendant herein in Plaquemines Parish, Louisiana.

2. **Plaintiff Class.** The Named Plaintiff herein proposes to proceed on behalf of a class of persons defined as follows:

   *All natural and juridical persons (excluding any state agencies or commissions, and excluding the U.S. federal government and any agencies or departments thereof) who own immovable property within the Louisiana coastal zone, which immovable property is subject to pipeline right-of-way agreements granted to, or pipeline right-of-way servitude expropriations in favor of, the Pipeline Defendants herein, within which run the pipelines denominated as the TGP 500-1, the TGP 500-2, and the TGP 527A-100 (see attached and incorporated map showing pipelines and Bradish Johnson property, at **Exhibit 1** to this Petition), where the banks of such canals have eroded beyond their constructed widths and/or property adjacent to such canals has eroded.*

   Excluded from the Class are the Judge to whom this case is assigned and his immediate family; and any persons with currently pending actions that would otherwise fit within the class definition. The Plaintiff reserves the right to revise the definition of the Class based on information learned through discovery.

3

***Pipeline Defendants***

3. As alleged by Bradish Johnson in its original Class Action Petition, Defendant Tennessee Gas Pipeline Company, LLC ("TGP") is a Delaware limited liability company having its principal place of business in Houston, Texas, and is named individually and as successor-in-interest to Tennessee Gas Transmission Company. TGP's principal business establishment in Louisiana is located in East Baton Rouge Parish, Louisiana. On information and belief, the sole member of TGP is Kinder Morgan Operating, L.P. "A" ("KMOLPA"). KMOLPA is a limited partnership that consists of two partners: Kinder Morgan Energy Partners, L.P. ("KMEP") and Kinder Morgan G.P., Inc. (KMGP"). KMEP is a Delaware limited partnership having its principal place of business in Texas, and its two partners are Kinder Morgan, Inc. ("KMI") and KMGP. KMGP is a Delaware corporation having its principal place of business in Texas. KMI is a Delaware corporation having its principal place of business in Texas. Therefore, TGP is a citizen of, at least, Delaware and Texas. TGP made further allegations regarding its citizenship in its Notice of Removal, and Bradish Johnson has no basis do dispute those allegations.

4. As alleged in the original Class Action Petition, Defendant Kinetica Energy Express, LLC ("Kinetica"), named a defendant in its current capacity and as successor-in-interest to a portion of the pipeline rights-of-way at issue herein originally granted to TGP, is a Texas limited liability company having its principal place of business in Texas. The sole member of Kinetica is Kinetica Partners, LLC. The members of Kinetica Partners, LLC include the following: (1) FSH Midstream, LLC, a Texas limited liability company comprised of numerous individual members, none of whom are citizens of Louisiana; (2) McCombs Family Partners, Ltd., a Texas limited partnership comprised of Texas citizens; (3) Eckard Global Energy, LLC, a Texas limited liability company composed of one individual member who is not a Louisiana

citizen; (4) Houma Partners, LP, a Texas limited partnership composed of Texas citizens; and (5) Midstream Development Company, LLC, a Texas limited liability company comprised of individual members, none of whom are Louisiana citizens. The identities of every one of Kinetica's indirect owners are not publicly available or otherwise known to Plaintiff, but on information and belief, Kinetica is not a citizen of the State of Louisiana. TGP made further allegations as to Kinetica's citizenship in the Notice of Removal in this matter, and Bradish Johnson has no basis to dispute those allegations.

5.  The Defendants identified in the paragraphs above, either in their own capacity or in their capacity as successor-in-interest to the original grantee of the rights-of-way at issue as specified herein, are herein referred to collectively as "the Pipeline Defendants."

## JURISDICTION AND VENUE

6.  This Court has personal jurisdiction over the Pipeline Defendants because the Pipeline Defendants have sufficient minimum contacts with the State of Louisiana so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Indeed, the Pipeline Defendants conduct substantial business in Louisiana. Subject matter jurisdiction lies with this Court, as detailed in the Notice of Removal, under the Class Action Fairness Act and under the general diversity jurisdiction provisions at 28 U.S.C. § 1332, as there is complete diversity between Bradish Johnson and the Defendants, and the amount in controversy exceeds the jurisdictional thresholds under both CAFA and the general diversity jurisdiction requirements.

7.  Venue was proper in the Civil District Court for Orleans Parish, where the original Class Action Petition was filed, pursuant to Louisiana Code of Civil Procedure article 76.1, as the right-of-way agreements granted by Named Plaintiff's predecessor-in-interest were executed in Orleans

Parish. Venue is proper now, in this Court, as the original Class Action Petition was properly removed to the federal district court encompassing the state court where the action was originally filed.

## ALLEGATIONS

### *The Vital Importance of Louisiana's Coastal Lands*

8.  Louisiana's coastal lands are an ecologically rich, culturally vital, and economically important zone of swamp, marshland, and other wetlands, built over thousands of years as the Mississippi River and its distributaries have deposited sediments and nutrients on their way toward the Gulf of Mexico.

9.  Traditionally, Louisiana's coastal lands have been the home to a rich diversity of land animals and marine life, that have supported the inhabitants of these lands through hunting, fishing, shrimping, oystering, and trapping.

10. These coastal lands have also supported a way of life passed on through generations of property owners, as the land and the culture it supports has been a touchstone of family and community connectedness.

11. Crucially, the coastal lands also are a buffer against storm surge from tropical storms, hurricanes, and other tropical weather events, serving as the first line of defense for the communities of southern Louisiana.

12. Coastal lands also have an inherent economic value of their own. As those lands erode and wash away, that value to the property owners also literally washes away.

13. Louisiana's coastal lands, however, have been disappearing at an alarming rate, and are in dire need of restoration.

14. The value of Louisiana's coastal lands has been recognized in official articulations of public policy of the State.

    14.1    For example, the Louisiana Legislature has declared with regard to coastal land loss: "Hurricane protection and coastal restoration must be integrated to achieve a long-term solution of coastal protection. In addition to immediate needs for hurricane protection, coastal land loss in Louisiana continues in catastrophic proportions. Wetlands loss threatens valuable fish and wildlife production and the viability of residential, agricultural, energy, and industrial development in coastal Louisiana." La. R.S. § 49:214.1(A).

    14.2    The Legislature has also declared it "the public policy of the state to develop and implement, on a comprehensive and coordinated basis, an integrated coastal protection program in order to reduce if not eliminate the catastrophic rate of coastal land loss in Louisiana." La. R.S. § 49:214.1(D).

    14.3    Similarly, the Legislature declared "that it is the public policy of the state … [t]o protect, develop, and, where feasible, restore or enhance the resources of the state's coastal zone"; and "[t]o support sustainable development in the coastal zone that accounts for potential impacts from hurricanes and other natural disasters and avoids environmental degradation resulting from damage to infrastructure caused by natural disasters." La. R.S. § 49:214.22(1) and (8).

    14.4    The 2017 Louisiana Comprehensive Master Plan for a Sustainable Coast has made the connection between the Pipeline Defendants' conduct and the damage to these public-policy-protected wetlands: "Dredging canals for energy exploration and pipelines provided our nation with critical energy supplies, but these activities took a

toll on the landscape, altering wetland hydrology and leading to land loss…. Land loss reduces shorelines, marshes, and swamps that are a vital barrier and our first line of defense against storm surge and flooding. Coastal flooding has become an all-too-common occurrence due to powerful storm surges associated with tropical events made worse over the years by subsidence, sea level rise, and coastal land loss."

14.5    Louisiana's Governor has also highlighted the critical state of the coast, in an emergency proclamation (Proclamation No. 43 JBE 2017) on April 18, 2017: "[T]he Louisiana coast is in a state of crisis and emergency that requires immediate and urgent action and attention to avert further injury to the lives, property, health, safety, and welfare of the citizens of Louisiana and the nation."

14.6    Applying the constitutionally enshrined public trust doctrine, located in the 1974 Louisiana Constitution at Article IX, § 1, and previously located in the 1921 Louisiana Constitution at Article VI, § 1, the Louisiana Supreme Court in *Avenal v. State*, 886 So. 2d 1085, 1101-02 (La. 2004), held that the public policy of the State with regard to coastal wetlands was to preserve those wetlands both to protect, conserve, and replenish the natural resources of the state and to protect the health, safety, and welfare of the people: "The public resource at issue is our very coastline, the loss of which is occurring at an alarming rate. The risks involved are not just environmental, but involve the health, safety, and welfare of our people, as coastal erosion removes an important barrier between large populations and ever-threatening hurricanes and storms. Left unchecked, it will result in the loss of the very land on which Louisianians reside and work, not to mention the loss of businesses that rely on the coastal region as a transportation infrastructure vital to the region's industry and commerce."

15. The Named Plaintiff, and all those similarly situated, owns Louisiana coastal lands, and directly benefits from all the critical characteristics of those lands.

***Pipeline Defendants' Canals Alter the Coastal Landscape***

16. After World War II, the Pipeline Defendants installed a network of natural gas pipelines across Louisiana's coastal lands.

17. In order to install their pipelines across the swamps and marshland in the coastal lands, the Pipeline Defendants secured rights-of-way, both through right-of-way agreements with landowners and through expropriation judgments, which established personal servitudes of rights of use that allowed the Pipeline Defendants to install, operate, and maintain pipelines through Louisiana's coastal wetlands through the accessory right to dredge flotation canals through which the barges and other equipment for installation, operation, and maintenance of the pipelines could be navigated.

18. The exemplar of the gas pipelines traversing coastal Louisiana in the Mississippi Delta Marsh Region was the Muskrat Line, which TGP built in the mid-1950s.

19. The Muskrat Line was the first large-scale 24-inch-diameter natural gas pipeline constructed through coastal Louisiana, paralleling Louisiana's coast, and part of TGP's 355-mile natural gas gathering system in Louisiana's coastal wetlands.

20. The Muskrat Line (including the line denominated as the "500-1" line, as well as portions of the "500-2" line that parallel the 500-1 line for a certain length before turning on a divergent course) traverses the Named Plaintiff's Property.

21. The Muskrat Line was laid by barge that accessed the coastal wetlands by way of a 40-foot-wide canal that was dredged through the marsh by what workers in the industry referred to as a "marsh-eating machine."

22. The dirt removed by the marsh-eating machines to create the canals—the "spoil"—was dumped in long, tall lines parallel to the canals on either side, known as "spoil banks."

23. When the marsh-eating machines' work was completed, a 40-foot-wide canal bisected the 5,000-year-old marshland.

24. Other pipeline companies, including each of the Pipeline Defendants, constructed pipelines using flotation canals that adhered to the Muskrat Line exemplar, using the same marsh-eating machine and processes as TGP's Muskrat Line, leaving approximately 40-foot-wide canals immediately upon completion of construction and installation of a single pipeline and approximately 65-foot-wide canals immediately upon completion of dual, parallel pipelines.

25. Pipeline Defendants' use of the TGP-pioneered marsh-eating flotation-canal method exemplified the industry standard and template for construction of pipelines through Louisiana's coastal wetlands throughout the 1950s, 1960s, and into the 1970s.

26. Upon completion, the resulting pipeline canals were used by the Pipeline Defendants to facilitate maintenance and inspections of the pipelines.

27. At least by the time of the construction of the Muskrat line, in 1955, residents in the Mississippi Delta Marsh Region expressed their concern to the Corps of Engineers and State wildlife officials that the pipeline canals would alter the hydrology of the marsh if proper preventive measures were not included and maintained.

28. During the design phase of the Muskrat Line, as reflected in a promotional film produced by TGP's predecessor in 1956, Tennessee Gas recognized that its canals could facilitate saltwater intrusion that would kill native plant and animal species, if protective structures were not included and maintained to impede that saltwater intrusion.

29. In the design phase for the Muskrat line, preconstruction, TGP also recognized that, without the installation and maintenance of certain structures limiting recreational and commercial use of the canals, boat traffic would erode the banks.

30. At least by 1955, TGP also knew of various other potential risks if the flotation canals and their protective structures were not properly maintained, including specifically that the tidal flow would impact the canals where they intersected natural waterways.

31. Many industry documents show that all of the Pipeline Defendants knew of these deleterious consequences if canals and their protective structures were not properly protected and maintained in a manner that would cause the least possible damage to the servient estate.

32. As a remedy to landowners, and in response to the concern from federal and state agencies, TGP, in 1955, proposed stopping the potential saltwater intrusion and hydrologic changes with plugs, gates, dams, and bulkheads (collectively, "protective structures") by including 240 such structures along its 355-mile Muskrat line.

33. Pipeline Defendants developed plans for where these protective structures were needed and would be constructed, including these as specifications in construction contracts with the companies that performed the marsh-eating operation.

34. Pipeline Defendants found it expensive to maintain these protective structures, and decided to stop maintaining and rebuilding them.

35. Pipeline Defendants took no steps to stabilize, fortify, or armor the banks of the canals, additional steps they knew would prevent erosion of the banks.

36. Pipeline Defendants have periodically inspected the pipelines and their accessory canals and observed the deterioration of the protective structures and the erosion of the canal banks. Pipeline Defendants could see as early as the 1950s that, without full commitment to proper

maintenance of the canal banks and the protective structures, the canals were getting wider, the marsh was eroding, and the integrity of the marsh was becoming further compromised as evidenced by increased ponding outside the canal banks and deterioration of the surrounding marshlands.

37. The hydrologic changes Pipeline Defendants anticipated would occur without the installation and proper maintenance of preventive and protective structures and measures occurred and damaged the marsh—including the property of the Named Plaintiff and all those similarly situated—in significant ways.

***The Pipeline Defendants Uniformly Knew about the Damage They Were Causing to Louisiana's Wetlands, and About the Steps Available to Them to Prevent this Damage and to Prevent Further Damage, all of which was Documented in the Battelle Report***

38. All of the Pipeline Defendants or their predecessors-in-interest, in concert, were part of a consortium of pipeline companies that commissioned a study of historically known effects of pipeline canals on the Louisiana coastal wetlands, resulting in the Battelle Columbus Laboratories report in 1972 ("the Battelle Report") that recognized that the pipeline companies' actions were causing deterioration and erosion, that they had known of these consequences for decades, and that they had known of the steps—including installation and maintenance of protective structures and armoring of the canal banks—to take to prevent these consequences.

39. Specifically, the Battelle Report was commissioned and sponsored by "the Offshore Pipeline Committee," which included the Pipeline Defendants here, or their predecessors-in-interest.

40. The Battelle Report was not formulating new opinions or data on the effect of pipeline operations in Louisiana's wetlands, but was expressly "documenting the existing knowledge on the environmental effects of gas pipeline operations in the marshlands" and "[f]ormulating

general conclusions, based upon the present state of knowledge, of the impacts of developments following the offshore lease sales." Specifically defined as within the matrix of "Gas Pipeline Industry Activities" in the Battelle Report, the report included "canal maintenance" and "[f]ill and berm maintenance."

41. The information developed by the Battelle Report "should be applicable to developments involving all marshland types." The study area of the Battelle Report included all of the parishes in the Louisiana coastal zone, including all of those areas included within the scope of the proposed class definition here: St. Bernard, Orleans, Plaquemines, Jefferson, St. John the Baptist, St. Charles, Lafourche, and Terrebonne parishes, as well as St. Mary, St. Tammany, Iberia, Vermilion, Cameron, and Calcasieu parishes.

42. The Battelle Report emphasized that the effects of pipelining should not be reviewed by focusing on discrete units, but instead by analyzing the entire coastal marshlands as an ecosystem: "[I]t is important to remember that the coastal marshlands represent a continuous unit in time and space, i.e., we are dealing with an ecosystem. As Gates has noted, 'the complexity of an ecosystem is enormous for, by definition, it is the total sum of the organisms, the environment, and the processes of interaction between and within all parts of the system.' By concentrating our efforts on discrete factors, we may be ignoring important parts of the system or minimizing subtle but significant interactions."

43. The Battelle Report defined the flotation-canal method of pipeline installation as "utiliz[ing] a flotation canal to provide access for the pipe-laying equipment," with such canals "be[ing] 40 to 50 feet wide and 6 to 8 feet deep[.]"

44. The Battelle Report recognized that bulkheads, plugs, or dams would "minimize erosion and … prevent navigation traffic, which is a prime cause of erosion." The report noted as an

example a 284-mile line constructed in the late 1950s that employed 240 bulkheads for 135 crossings of navigable streams.

45. The Battelle Report noted that, "where care has been taken in construction and operation of the gas pipeline, the environmental effects are minimal."

46. However, the Battelle Report recognized that care is not taken. "Land loss due to canaling is a matter of serious concern in Louisiana." The Battelle Report listed as the known disadvantages of flotation canals where proper means of care are not taken, "(1) More or less permanent alteration of landscape; greater loss of land. (2) Drainage patterns may be changed depending on use of bulkheading and on spoil bank treatment. (3) Erosion of land may result if navigation traffic is not prevented. (4) Backfilling is impractical since spill that is removed is so fluid it cannot be stockpiled." The Battelle Report further listed as consequences of these physical changes when proper means of care are not taken, "a. changes in tidal flow patterns, b. changes in seasonal flow characteristics, c. flooding and storm conditions worsened, d. salinity pattern changes, … [and] o. changes in erosional and depositional patterns."

47. The Battelle Report concluded, "Erosion of canals is a problem in coastal Louisiana. The primary cause appears to be boat traffic, though sometimes tidal currents can provide significant scouring action." The Battelle Report highlighted as one example the canal through the Rockefeller Wildlife Refuge, as to which it noted that erosion "ha[d] been observed for the past 20 years," with that observed erosion therefore extending back into the mid-1950s.

48. Analyzing historical use of damming of canals and use of shell facing to armor the banks of canals, the Battelle Report concluded that, "when properly done, [these protection measures] eliminate[] them as foci of erosion." "[I]n fact," noted the Battelle Report, "the prevention of [] boat traffic is one of the principal reasons for bulkheading or plugging the canal after

14

completion of a pipeline. (The other is to minimize alteration or existing hydrology and drainage patterns.)" The Battelle Report noted, therefore, that "where canals have been blocked" pipelining will likely not be a contributor to erosion. "However, if bulkheads and dams are not maintained they can wash out around the end permitting water flow, **_and inspection and maintenance is required_** to ensure that these continue to fulfill their designed function." (Emphasis added).

49. The Battelle Report also aggregated the existing knowledge that the treatment of the spoil banks from flotation-canal techniques "can have both physical and chemical effects. Physically, the spoil banks or levees change the drainage and use patterns of the marsh."

50. The Battelle Report also analyzed that the failure to properly bulkhead and dam pipeline canals can cause changes in salinity in the marshlands.

### _The Pipeline Defendants Have Decided to Not Properly Implement the Knowledge Documented in the Battelle Report_

51. As documented in the Battelle Report, the Pipeline Defendants knew and expected that, if they did not take well-known measures to protect the servient estate from erosion and alteration of the wetlands' hydrology, then that erosion and alteration would occur.

52. Nevertheless, the Pipeline Defendants failed to take the steps that the Battelle Report shows they knew they should take.

53. The Pipeline Defendants regularly inspected their pipeline routes through Louisiana's wetlands by air. In these inspections, they observed the protective structures degrading, the canals getting wider, the banks of the canals slumping, and the integrity of the surrounding marsh being compromised, as evidenced by ponding and marsh deterioration outside the canal banks.

54. When the protective structures began to degrade and the pipeline canals began to erode, Pipeline Defendants did not take appropriate measures to restore the protective structures or

the originally constructed widths of those canals or to otherwise restore the property of the landowners, including Named Plaintiffs, across which those canals ran.

55. As a result of Pipeline Defendants' failures to engage in measures that would maintain the protective structures and the widths of the canals at their constructed parameters and prevent loss of coastal lands—many of those measures identified within their own commissioned study, the Battelle Report—those canals have quickly and foreseeably widened to widths far greater than their constructed widths, often double or triple the constructed width, and even eroding fully into open water.

56. Regardless whether the coastal lands are saltwater marsh, freshwater marsh and swamp, or brackish marsh, the above-alleged acts and omissions of Pipeline Defendants have led to the loss of vital coastal lands.

### *Louisiana Law Applicable to the Personal Servitudes of Rights of Use Obligated Pipeline Defendants to Prevent Erosion of the Landowners' Land*

57. Not only did the Pipeline Defendants foresee that their conduct would cause the erosion of landowners' land as protective structures were neglected, improperly maintained and protected canals widened, and spoil banks caused land loss, but they had obligations as the holders and grantees of personal servitudes of rights of use to prevent this predictable erosion from occurring.

58. The Pipeline Defendants' rights across the landowners' properties—whether created by right-of-way agreements ("ROWs") or expropriation judgments—are, under Louisiana law, personal servitudes of rights of use.

59. The following provisions apply to all of the Pipeline Defendants' rights of use across landowners' properties, regardless of any immaterial differences in ROW or expropriation judgment language:

59.1    The Pipeline Defendants may dredge a canal through a landowner's property as an accessory right to the construction and installation of a pipeline through coastal wetlands.

59.2    However, the Pipeline Defendants must exercise their right of use, including the accessory right to employ canals, in a manner that causes the least inconvenience to the landowners.

59.3    The Pipeline Defendants may not exercise their right of use, including the canals, in a manner that aggravates the servient estates of the landowners.

59.4    Regardless whether a particular ROW or expropriation judgment provides an express measurement limitation to a canal width, the Pipeline Defendants' rights of use require that canals must be maintained at a width no larger than that required for the exercise of the designated use—the construction, operation, and maintenance of a pipeline.

59.5    The Pipeline Defendants' rights of use may be exercised only in a manner least inconvenient to the landowners and in such a manner as to not aggravate the servient estates of the landowners, which would require that such canals include properly maintained protective structures and other measures to prevent erosion of the canals beyond the prevailing construction widths for canals at the time they were constructed.

59.6    The Pipeline Defendants are obligated to engage in maintenance and repairs of the canals and any protective structures appurtenant to the canals, regardless whether those repairs are necessitated by *force majeur*, accident, normal wear and tear, or Pipeline Defendants' own fault or neglect.

60. Pipeline Defendants may only be exonerated from any of these duties by express language in a written ROW or expropriation judgment, and only if such exoneration does not violate public policy.

61. Public policy in Louisiana requires measures to prevent or restore coastal land-loss, and that public policy would be violated by any exoneration from a duty to do so.

62. Therefore, as to the Named Plaintiff and those similarly situated, the failure to maintain protective structures and other preventive measures, resulting in the widening of the canals beyond the widths necessary for the initial installation of the pipelines, was caused by Pipeline Defendants' breach of their obligations under Louisiana law, obligations from which they may not be excused.

63. Because the Pipeline Defendants' rights of use remain ongoing, the obligations of the Pipeline Defendants are likewise continuing.

64. If no action is taken to abate the loss of land, it will continue, as the canals will continue to widen, and the detrimental effects of the Pipeline Defendants' failures to adequately protect the lands owned by Named Plaintiff, and those similarly situated, from erosive forces will continue.

***Named Plaintiff's ROWs Granted to the Pipeline Defendants Are Typical of the Relationship Between Each Pipeline Defendant and those Class Members Across Whose Property Pipeline Defendants Operate***

65. Named Plaintiff is the owner of property located in Plaquemines Parish that is subject to ROWs pursuant to which the Pipeline Defendants have right-of-use servitudes to install and maintain pipelines, with the accessory right to dredge canals within which to conduct that use on Named Plaintiff's Property.

18

66. The TGP ROWs include the following: Bradish Johnson Company, Ltd. to Tennessee Gas Transmission Company, September 19, 1957, C.O.B. 201, Folio 765 (hereinafter, "1957 TGP ROW"); Bradish Johnson Company, Ltd. to Tennessee Gas Transmission Company, April 10, 1964, C.O.B. 273, Folio 872 (hereinafter, "1964 TGP ROW"); and Bradish Johnson Company, Ltd. to Tennessee Gas Transmission Company, March 25, 1966, C.O.B. 297, Folio 782 (hereinafter "1966 TGP ROW").

67. The pipelines running through the TGP ROWs include those denominated as the TGP 500-1 line, the TGP 500-2 line, and the TGP 527A-100 line. TGP is the current owner and operator of the TGP 500-2 line. Kinetica is the current owner and operator of at least portions of the TGP 500-1 line and TGP 527A-100 line.

68. Named Plaintiff's Property is composed of coastal wetlands. Prior to the activities complained of herein, the marsh was healthy with consistent marsh vegetation and a stable hydrologic ecosystem.

69. Named Plaintiff is the direct successor-in-interest to the above referenced grantor on each of the ROWs.

70. Each of these ROWs remain in force and effect.

71. Each of these ROWs designated the use as to which each respective Pipeline Defendant had a right as the right to construct, maintain, and operate one or more pipelines across the Named Plaintiff's Property, with the accessory right to carry out that use within a canal that each respective Pipeline Defendant was allowed to dredge across that property.

72. Each of these ROWs contained terms that only confirmed the duties and obligations laid out in the suppletive rules applicable to personal servitudes of rights of use in the Louisiana Civil

Code and that are common as to all of the Pipeline Defendants' flotation canal conduct in Louisiana's coastal wetlands.

73. None of these ROWs contained terms expressly exonerating any of the respective Pipeline Defendant's from the duties and obligations laid out in the suppletive rules applicable to personal servitudes of rights of use in the Louisiana Civil Code and that are common as to all of the Pipeline Defendants' flotation canal conduct in Louisiana's coastal wetlands.

## CLASS ACTION REQUISITES

74. The Named Plaintiff and all those similarly situated, as defined above, are entitled to maintain this action as a class action pursuant to Fed. R. Civ. P. 23 for the following reasons:

    74.1   The Class consists of more than 100 property owners in the Louisiana coastal zone, so numerous that joinder of all members is impracticable, satisfying Fed. R. Civ. P. 23(a)(1).

    74.2   Questions of law and fact common to all members of the Class are numerous, satisfying Fed. R. Civ. P. 23(a)(2); and those common questions of law and fact also predominate over individual issues, satisfying Red. R. Civ. P. 23(b)(3). Those common questions of law and fact include but are not limited to:

        74.2.A Whether Pipeline Defendants used a similar dredge-and-barge flotation canal system—*i.e.*, flotation canals and the use of "marsh-eating machines"—to construct and install pipelines across all affected properties in coastal Louisiana;

        74.2.B Whether Pipeline Defendants knew at the time of dredging of the canals that, without proper maintenance of the canal banks, and the construction and proper maintenance of protective structures, that the canal banks would

erode, hydrology and sedimentation would be deleteriously altered, and the landowners' land would be lost;

74.2.C Whether the failure to properly maintain the canal banks, properly construct and maintain protective structures, and repair any damage to class members' property, were necessary to conduct any public-purpose of the Pipeline Defendants' flotation-canal activities;

74.2.D Whether the Pipeline Defendants' failure to properly maintain the canal banks, properly construct and maintain protective structures, and repair any damage to class members' property was a cost-saving and feasibility choice made by each Pipeline Defendant as to their operations in coastal Louisiana;

74.2.E Whether the Pipeline Defendants' collusion to commission and sponsor the Battelle Report shows their coordinated and long-time knowledge of the consequences of their failure to properly maintain the canal banks, properly construct and maintain protective structures, and repair any damage to class members' property;

74.2.F Whether Pipeline Defendants' failure to properly maintain the canal banks, properly construct and maintain protective structures, and repair any damage to class members' property, in light of their knowledge of the consequences of such failures and knowledge of how to prevent or remedy such failures, constitutes bad faith;

74.2.G Whether Pipeline Defendants failed to properly maintain the canal banks and protective structures, to prevent erosion of the landowners' land, and, when erosion occurred, to restore the damage;

21

74.2.H Whether Pipeline Defendants are obligated to maintain the canals at a width no greater than reasonably necessary to install, operate, and maintain the pipelines, as a matter of law;

74.2.I Whether any exoneration of Pipeline Defendants from such obligation is a violation of Louisiana public policy, as a matter of law;

74.2.J Whether Louisiana Civil Code articles 539, 576, 577, 579, and 581, and their predecessor articles, apply to the pipeline rights-of-way and to the canals constructed by the Pipeline Defendants;

74.2.K Whether Louisiana Civil Code articles 730, 743, and 745, and their predecessor articles, apply to the pipeline rights-of-way and to the canals constructed by the Pipeline Defendants;

74.2.L Whether Pipeline Defendants' failure to properly maintain the canal banks, properly construct and maintain protective structures, and repair any damage to class members' property constitutes an abuse of right, as a matter of law;

74.2.M Whether Pipeline Defendants' failure to properly maintain the canal banks, properly construct and maintain protective structures, and repair any damage to class members' property constitutes an aggravation of the servient estate, as a matter of law;

74.2.N Whether Pipeline Defendants' failure to properly maintain the canal banks, properly construct and maintain protective structures, and repair any damage to class members' property breaches the obligation to cause the

least possible inconvenience to the Named Plaintiff and all those similarly situated, as a matter of law;

74.2.O  Whether Pipeline Defendants' failure to properly maintain the canal banks, properly construct and maintain protective structures, and repair any damage to class members' property, and otherwise prevent loss of land where that land-loss is the result of Pipeline Defendants' conduct constitutes a trespass, as a matter of law;

74.2.P  Whether Pipeline Defendants' failure to properly maintain the canal banks, properly construct and maintain protective structures, and repair any damage to class members' property, and otherwise prevent loss of land where that land-loss is the result of Pipeline Defendants' conduct constitutes a nuisance, as a matter of law;

74.2.Q  Whether the appropriate remedy for failure to properly maintain the canal banks, properly construct and maintain protective structures, and repair any damage to class members' property, and protect against resulting land-loss in Louisiana's coastal zone is a system-wide or eco-system-based approach, as concluded by the Battelle Report and as supported Louisiana's Coastal Master Plan;

74.2.R  Whether the appropriate remedy for failure to properly maintain the canal banks, properly construct and maintain protective structures, and repair any damage to class members' property, and protect against resulting land-loss in Louisiana's coastal zone includes the remedy of termination of the servitudes of right of use, as allowed under Civil Code article 623; and

23

74.2.S Whether the Pipeline Defendants may assert various common defenses, such as prescription or statutory peremption under La. R.S. § 9:5624, as to claims arising from failure to properly maintain the canal banks, properly construct and maintain protective structures, and repair any damage to class members' property.

74.3    The claims of the Named Plaintiff, with property located in the Louisiana Coastal Zone burdened by right-of-use servitudes in favor of the Pipeline Defendants that likewise burden all putative Class members' properties, are typical of the claims of the proposed Class members against the Pipeline Defendants, as required under Fed. R. Civ. P. 23(a)(3), because the Named Plaintiff has lost land to canal widening caused by the Pipeline Defendants' breach of obligations of holders of personal servitudes of rights-of-use; by the Pipeline Defendants' abuse of right; by the Pipeline Defendants' negligent conduct; by the Pipeline Defendants' trespass; and by the Pipeline Defendants' nuisance, all claims being pursued on behalf of all class members for similar damages caused by similar conduct.

74.4    The Named Plaintiff will fairly and adequately protect the interests of the proposed Class, as required under Fed. R. Civ. P. 23(a)(4), because it has an interest in preventing or ameliorating future deleterious effects of coastal land loss on its property and in rectifying the damage caused by past land loss.

74.5    The criteria for defining the proposed Class, as set out above, are objectively ascertainable on the face of written instruments—namely, the right-of-way agreements and expropriation judgments evidencing the creation of personal servitudes of rights-of-use in favor of Pipeline Defendants and their predecessors in interest.

74.6    Certification of a Class under Fed. R. Civ. P. 23(b)(1) is appropriate, because the prosecution of separate actions by individual property owners rather than a Class as proposed would create a risk of inconsistent or varying adjudications and the potential for imposition of inconsistent duties as to the Pipeline Defendants and for prejudicial determinations as to the rights of subsequent plaintiffs, as the Pipeline Defendants' conduct has harmed multiple class members based on a common pattern of conduct, with that harm being of a common character through a common causal process. Moreover, the coastal land-loss caused by Pipeline Defendants' consistent, systemic conduct is a systemic harm that requires a systemic remedy consistent with the systemic planning tool of the Coastal Master Plan.

74.7    Alternatively, certification of a Class under Fed. R. Civ. P. 23(b)(2) is appropriate because, due to the widespread effect of the Pipeline Defendants' actions, any resistance of liability by the Pipeline Defendants would be applicable to the whole of the proposed class, making class-wide injunctive relief appropriate.

74.8    Alternatively, if damages are deemed an appropriate remedy rather than class-wide adjudication of rights under Fed. R. Civ. P. 23(b)(1) or injunctive relief under Fed. R. Civ. P. 23(b)(2), then certification under Fed. R. Civ. P. 23(b)(3) is appropriate because, as noted above, the common issues of fact and law predominate over those issues that may pertain to individual plaintiffs' claims.

74.9    Also in satisfaction of Fed. R. Civ. P. 23(b)(3), the class action procedure is superior to other methods for the fair and efficient adjudication of the claims herein, because:

   74.9.A It is desirable to concentrate all litigation regarding the crisis of coastal land loss in the Louisiana coastal zone within a single forum;

3841361v1

74.9.B Class litigation is an efficient mechanism for managing the claims of the class members, due to the opportunity to afford reasonable notice of significant phases of the litigation to class members and to permit a systemic and integrated remedy and injunctive relief or, alternatively, distribution of any damages recovered; and

74.9.C The vindication of public policy interests in addressing coastal land loss and in requiring the Pipeline Defendants to comply with the law are implicated and therefore justify the invocation of the process of class litigation, including any attendant costs or burdens.

74.9.D Upon a determination of liability, causation, and entitlement to remedy, this Court may appoint a special master to administer a restoration plan and/or apportionment among the class and sub-class members of compensation for restoration costs and value of lost land and mineral rights as appropriate.

74.10   Further, even if the Court were to determine that certification is not appropriate as to some issues in this litigation, it may certify the Class for purposes of those particular issues that resolve common, class-wide issues as to which inconsistent adjudication would be detrimental, under Fed. R. Civ. P. 23(c)(4).

**COUNT I: BREACH OF THE OBLIGATIONS OF HOLDERS OF PERSONAL SERVITUDES OF RIGHTS OF USE, THROUGH BREACH OF SUPPLETIVE-RULES OBLIGATIONS AND VIOLATION OF PUBLIC POLICY (CLASS COUNT)**

75. All of the foregoing allegations are incorporated and adopted herein as if restated in full.

76. A personal servitude of right of use in favor of one or more of the Pipeline Defendants has been created as to each class member's property, whether by ROW or expropriation judgment.

A right of use is a limited personal servitude that confers the benefits of the predial servitude and usufruct upon a juridical person rather than upon an estate.

77. Pursuant to Louisiana Civil Code article 645, "[a] right of use is regulated by application of the rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing a right of use servitude."

78. Regarding the rules governing usufruct, Louisiana Civil Code article 576 provides that "the usufructuary [Pipeline Defendant] is answerable for losses resulting from his fraud, default, or neglect." Louisiana Civil Code article 577 similarly provides:

The usufructuary [Pipeline Defendant] is responsible for ordinary maintenance and repairs for keeping the property subject to the usufruct in good order, whether the need for these repairs arises from accident or force majeure, the normal use of things, or his fault or neglect.

The naked owner [Plaintiffs] is responsible for extraordinary repairs, unless they have become necessary as a result of the usufructuary's [Pipeline Defendant's] fault or neglect in which case the usufructuary [Pipeline Defendant] is bound to make them at his cost.

79. The Pipeline Defendants are obligated under Civil Code article 539 to use the class members' properties as a prudent administrator, and to preserve those properties as much as possible so that the properties may be restored to the class members at the end of the right-of-use servitude.

80. Louisiana Civil Code article 579 provides that, "[d]uring the existence of the usufruct, the naked owner [Plaintiff and those similarly situated] may compel the usufructuary [Pipeline Defendants] to make the repairs for which the usufructuary is responsible."

81. Regarding the rules governing predial servitudes, Pipeline Defendants became the dominant estate owners while Plaintiff and class members are the owners of the servient estate.

82. Under Louisiana Civil Code article 730, "doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate."

83. Louisiana Civil Code article 743 provides that rights that are necessary for the use of the servitude—*e.g.*, accessory rights such as the Pipeline Defendants' right to dredge the canals at issue herein, which was accessory to the primary right of use to construct, install, operate, and maintain pipelines—"are to be exercised in a way least inconvenient for the servient estate"; and article 745 provides that the dominant estate owner is "under the obligation of causing the least possible damage."

84. The Pipeline Defendants also had the obligation to not aggravate the condition of the class members' servient estates.

85. The Pipeline Defendants cannot be exonerated from these obligations because such exoneration would violate clear Louisiana public policy requiring the preservation of the natural resource of coastal lands.

86. Accordingly, the Pipeline Defendants had obligations to the Named Plaintiff and all those similarly situated to prevent erosion of landowners' land, including through maintaining the widths of the canals to the widths reasonably necessary for the purpose of construction and maintenance of the pipelines; to maintain any protective structures such as dams, bulkheads, and gates; and to otherwise prevent erosion of the class members' land and to restore any land lost due to Pipeline Defendants' use.

87. The Pipeline Defendants breached these obligations by negligently doing or failing to do, among other things, the following:

    a.    Take actions necessary to prevent damage of the servient estate through erosion of the canals and marsh destruction;

    b.    Maintain the canals and their banks to prevent erosion of the surrounding property;

    c.    Install and maintain protective structures to prevent canal widening and land loss;

      d.      Prevent unauthorized persons from using the canals to prevent widening and land loss;

      e.      At all times to use the then-best-available technology to prevent erosion and to restore land lost to erosive processes, including but not limited to taking those erosion-prevention methods documented in the Battelle Report;

      f.      Protect the servient estate against damage resulting from use of the servitude;

      g.      Not aggravate the condition of the servient estate;

      h.      Prevent the canals from widening;

      h.      Prevent the canal banks from being breached;

      i.      Use only so much of Plaintiff's Property as is necessary to conduct operations;

      j.      Act as a reasonably prudent operator to cause the least possible damage; and

      k.      Restore the damage caused to the servient estate.

88. Pipeline Defendants' failure to properly maintain the canal banks, properly construct and maintain protective structures, and repair any damage to class members' property constitute breaches of their obligations to not aggravate and to cause the least possible damage to the servient estate.

89. Pipeline Defendants have breached and continue to breach the foregoing obligations.

90. Pipeline Defendants' duties to not aggravate the condition of the servient estate are co-extensive with the life of the servitudes and, accordingly, are continuous.

91. Pipeline Defendants are in continuing breach of those obligations and duties.

92. At the time that Pipeline Defendants were granted the rights-of-use across the class members' properties, it was reasonably foreseeable to Pipeline Defendants that the failure to take appropriate actions to maintain the canal widths, to properly maintain the protective structures appurtenant to the canals, and to restore any eroded property as it occurred, among other

actions, would lead to the loss of land as a result of drastic hydrological alteration on the class members' properties.

93. The Pipeline Defendants' common knowledge is documented in the Battelle Report and those sources cited in the Battelle Report, as well as in numerous contemporaneous reports of industry knowledge and activity dating back to the time prior to construction of the Pipeline Defendants' flotation canals across Louisiana's coastal wetlands.

94. The Pipeline Defendants' joint commissioning of the Battelle Report shows that they colluded in compiling knowledge of the consequences of their conduct detailed herein, and that they colluded in ignoring that knowledge of those consequences and methods of avoiding, preventing, and remedying those consequences.

95. Pipeline Defendants' breaches were in bad faith, and these breaches caused damage to the class members.

96. As a result of Pipeline Defendants' bad faith breach of contract, Pipeline Defendants are liable to class members not only for all damages that are foreseeable under Louisiana Civil Code article 1996, but also for all consequential damages under Louisiana Civil Code article 1997.

97. Pipeline Defendants are liable to class members for any and all remedy determined appropriate by this Court, including but not limited to coastal land-loss restoration addressing impacts to class members' property that are consistent with the Louisiana Coastal Master Plan, injunctive relief to restore the original-width canal banks and coastal land on class members' property, injunctive relief to construct and maintain protective structures and methods (as demonstrated by the Pipeline Defendants' historical knowledge memorialized in the Battelle Report) and to restore future land-loss, and/or monetary compensation in the amount that compliance with the Pipeline Defendants' obligations and restoration of the lost property would cost.

## COUNT 2: ABUSE OF RIGHT (CLASS COUNT)

98. All of the foregoing allegations are incorporated and adopted herein as if restated in full.

99. The Pipeline Defendants' exercise of their accessory rights of use of the class members' property by dredging canals for the installation and construction of pipelines constituted an abuse of right because:

99.1    There is no serious or legitimate motive for Pipeline Defendants to have failed to properly maintain the canal banks and canal widths, to fail to properly maintain protective structures appurtenant to the canals, and to fail to restore lost and damages land on class members' property as it occurred;

99.2    Pipeline Defendants' conduct as outlined herein, because Pipeline Defendants knew it would lead to the loss of coastal wetlands, was against good faith and against public policy; and

99.3    Pipeline Defendants' conduct as outlined herein was not exercised for the purpose of installing, constructing, operating, or maintaining the pipelines, the purpose for which the use was granted.

100.    Pursuant to Louisiana Civil Code article 623, "The usufruct may be terminated by the naked owner if the usufructuary commits waste, alienates things without authority, neglects to make ordinary repairs, or abuses his enjoyment in any other manner." Accordingly, in addition to the remedies sought above for breach of contract, the Pipeline Defendants' abuse of right also allows for the remedy of termination of the pipeline rights-of-way. Accordingly, the class members are entitled to the termination of the rights-of-way and restoration and return of their property in the condition it was in at the inception of the rights-of-way.

## COUNT 3: NEGLIGENCE (CLASS COUNT)

101.    Named Plaintiff incorporates by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

102.    Pipeline Defendants knew, or in the exercise of reasonable care should have known, that their acts and/or omissions outlined herein would cause the damages outlined herein and could have been prevented in the exercise of reasonable care.

103.    Pipeline Defendants owed a duty to class members to do, among other things, the following:

    a.    Take actions necessary to prevent excess widening of the canals;

    b.    Maintain the canals and their banks to prevent erosion of land and damage to the surrounding property;

    c.    Install and maintain protective structures to prevent canal widening and land loss;

    d.    Prevent unauthorized persons from using the canals to prevent canal widening and land loss;

    e.    At all times to use the then-best-available technology to prevent erosion and to restore land lost to erosive processes, including but not limited to taking those erosion-prevention methods documented in the Battelle Report;

    f.    Protect the servient estate against damage resulting from use of the servitude;

    g.    Not aggravate the condition of the servient estate;

    f.    Prevent the canals from widening;

    g.    Prevent the canal banks from being breached;

    h.    Use only so much of class members' property as necessary to conduct operations;

    i.    Act as a reasonably prudent operator to cause the least possible damage; and

    j.    Restore the property.

32

104.    Yet, Pipeline Defendants failed, and continue to fail, to exercise such reasonable care and have breached the duties outlined above.

105.    The breach of the duties referenced above has caused and continues to cause widening of the canals and erosion of class members' property.

106.    Pipeline Defendants have adopted company-wide policies of negligently operating, inspecting, and maintaining their rights-of-way, canals, and pipelines.

107.    Pipeline Defendants' negligent operation and maintenance of the rights-of-way, canals, and protective structures appurtenant to those canals on class members' property constitutes a pattern of negligent conduct that gives rise to a continuous tort. Pipeline Defendants' operation and maintenance of the canals and the protective structures falls well below the standard of care of a reasonably prudent operator. This pattern of negligent conduct has caused continuous and ever-increasing damage to class members' property in a manner common among all members of the class, and such damage will continue until rights-of-way, canals, and protective structures are properly used and maintained, and the land is restored.

108.    Thus, in accordance with the Louisiana Civil Code, including article 2315, Pipeline Defendants are liable to class members for any and all remedy determined appropriate by this Court, including but not limited to coastal land-loss restoration addressing impacts to class members' property that are consistent with the Louisiana Coastal Master Plan, injunctive relief to restore the original-width canal banks and coastal land on class members' property, injunctive relief to construct and maintain protective structures (as demonstrated by the Pipeline Defendants' historical knowledge memorialized in the Battelle Report) and to restore future land-loss, and/or monetary compensation in the amount that compliance with the standard of care and restoration of the lost property would cost.

3841361v1

## COUNT 4: TRESPASS (CLASS COUNT)

109.    Named Plaintiff incorporates by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

110.    Pipeline Defendants' conduct within their granted servitudes of rights of use—including but not limited to their improper maintenance of the canal banks, and improper maintenance of protective structures appurtenant to the canals—caused erosion of the canals and the class members' coastal land.

111.    That erosion and land-loss constitutes a physical invasion of the class members' property rights that is beyond the authorization of Pipeline Defendants' rights of use, and is therefore a trespass under Louisiana law.

112.    The Pipeline Defendants had knowledge that constitutes substantial certainty that their failure to properly maintain the canal banks, failure to properly maintain the protective structures, and failure to restore land lost to erosion as it occurred would cause the physical invasion of the class members' properties, that invasion composed of the erosion of the canal banks and loss of coastal land.

113.    Accordingly, Pipeline Defendants are liable to remove the encroaching trespass condition—essentially, the water that has replaced class members' land—through restoration of the coastal land and the return and maintenance of the canals to non-trespassing widths and return and maintenance of protective structures (as demonstrated by the Pipeline Defendants' historical knowledge memorialized in the Battelle Report); or, alternatively, the cost of such restoration and maintenance.

114.    Also, because Pipeline Defendants knew that the physical invasion of the class members' property was likely to occur as a result of their conduct, their trespass was in bad faith, and

they are liable to class members for the profit they have derived from such trespassing use of the rights-of-way, measured by the net revenues gained by Pipeline Defendants through their trespassing use of pipelines across the class members' properties.

### COUNT 5: NUISANCE (CLASS COUNT)

115. Named Plaintiff incorporates by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

116. Pipeline Defendants, under their rights-of-use servitudes on each class member's property, are each the neighbor of the respective class members across which each Pipeline Defendant's right of way travels, for purposes of the vicinage obligations under Louisiana Civil Code articles 667, *et seq.*

117. Pipeline Defendants' use of their respective estates within the servitude areas deprived class members of their liberty to enjoy their property adjacent to those rights-of-way because Pipeline Defendants' conduct caused the erosion and loss of coastal lands constituting that adjacent property.

118. Pipeline Defendants had knowledge that their conduct, as outlined above, would impair the class members' enjoyment of their adjacent property by causing the erosion of that property.

119. Accordingly, Pipeline Defendants are liable to class members for any and all remedy determined appropriate by this Court, including but not limited to coastal land-loss restoration addressing impacts to class members' property that are consistent with the Louisiana Coastal Master Plan, injunctive relief to restore the original-width canal banks and coastal land on class members' property, injunctive relief to construct and maintain protective structures (as demonstrated by the Pipeline Defendants' historical knowledge memorialized in the Battelle

Report) and to restore future land-loss, and/or monetary compensation in the amount that avoidance of the nuisance would have cost.

**WHEREFORE**, the Named Plaintiff and all those similarly situated pray that, after due proceedings be had, there be judgment rendered in their favor and against Pipeline Defendants finding that Pipeline Defendants are liable and indebted to the Named Plaintiff and all those similarly situated for:

a) Injunctive relief in the form of abatement and restoration of the coastal land loss at issue, including all manner of abatement and restoration activities determined to be appropriate, as exemplified in and not inconsistent with the state's Coastal Master Plan, and for ongoing maintenance and repairs to address and prevent future coastal land loss;

b) The award of costs, expenses, and/or reasonable attorneys' fees in favor of the Named Plaintiff to the fullest extent authorized by law;

c) Alternatively, all damages as are just and reasonable under the circumstances;

d) Judicial interest from the date of the judicial demand; and

e) Such other and further relief that the Court deems necessary and proper at law and in equity and that may be just and reasonable under the circumstances of this matter.

Finally, the Plaintiff, individually and on behalf of all those similarly situated, demand that the claims asserted herein be by adjudicated by jury trial.

Respectfully submitted,

*/s/ H.S. Bartlett III*
James R. Swanson (LA Bar No. 18455)
(jswanson@fishmanhaygood.com)

36

Stephen J. Herman (LA Bar No. 23129)
(sherman@fishmanhaygood.com)
Kerry J. Miller (LA Bar No. 24562)
(kmiller@fishmanhaygood.com)
H.S. Bartlett III (LA Bar No. 26795)
(tbartlett@fishmanhaygood.com)
Lance C. McCardle (LA Bar No. 29971)
(lmccardle@fishmanhaygood.com)
E. Blair Schilling (LA Bar No. 35308)
(bschilling@fishmanhaygood.com)
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana 70170
Telephone: (504) 586-5252
Facsimile: (504) 586-5250

Gladstone N. Jones, III (LA Bar No. 22221)
(gjones@jonesswanson.com)
Michael P. Arata (LA Bar No. 21448)
(marata@jonesswanson.com)
Kevin E. Huddell (LA Bar No. 26930)
(khuddell@jonesswanson.com)
John T. Arnold (LA Bar No. 31601)
(jarnold@jonesswanson.com)
JONES SWANSON HUDDELL, L.L.C.
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Facsimile: (504) 523-2508

S. Jacob Braud (LA Bar No. 28318)
(Jacob@NolaAttorneys.com)
BALLAY, BRAUD & COLON, PLC
8114 Highway 23, Suite 101
Belle Chasse, Louisiana 70037
Telephone: (504) 394-9841
Facsimile: (504) 394-9945

A.M. "Tony" Clayton (LA Bar No. 21191)
D'Ann R. Penner
(dpenner@claytonfrugelaw.com)
CLAYTON, FRUGÉ, WARD & HENDRY
3741 La. Highway 1 South
Port Allen, Louisiana 70767
Telephone: (225) 344-7000
Facsimile: (225) 383-7631

37

T. Taylor Townsend (LA Bar No. 20021)
T. Taylor Townsend, LLC
320 Saint Denis Street
Natchitoches, LA 71457
Telephone: (318) 238-3612
Facsimile: (318) 238-6103

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 9th day of February, 2024, I electronically filed the foregoing pleading using the CM/ECF System, which will send notice of the electronic filing to all counsel of record.

*/s/ H.S. Bartlett III*

**H.S. Bartlett III**

3841361v1