## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **BRADISH JOHNSON CO., LIMITED,** individually and as representative of all those similarly situated | **CIVIL ACTION NO. 2:23-CV-07363**<br><br>**SECTION "J"(4)** |
| **VS.** | **JUDGE CARL J. BARBIER** |
| **TENNESSEE GAS PIPELINE COMPANY, LLC and KINETICA ENERGY EXPRESS, LLC** | **MAGISTRATE KAREN WELLS ROBY** |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Plaintiff, Bradish Johnson Co., Limited ("Bradish Johnson"), provides this memorandum in support of its motion for certification of the following class:

> *All natural and juridical persons (excluding the State and any state agencies or commissions, and excluding the U.S. federal government and any agencies or departments thereof) who own immovable property within the Louisiana coastal zone, which immovable property is subject to pipeline right-of-way agreements granted to, or pipeline right-of-way servitude expropriations in favor of, Tennessee Gas Pipeline Company, LLC, Kinetica Energy Express, LLC, and/or their predecessors in interest, within which run the pipelines denominated as the TGP 500-1, the TGP 500-2, and the TGP 527A-100.*[1]

---

[1] *See* Affidavit of John A. Lopez, Ph.D. ("Lopez Aff.") (**Exh. A** hereto) at ¶ 4, Exhibit 2 for a map showing pipelines and Bradish Johnson property. Excluded from the proposed class are the Judge to whom this case is assigned and his immediate family; and any persons with pending actions at the time of class certification that would otherwise fit within the class definition.

This proposed class of landowners is united under an overarching common legal question: Does Louisiana law impose a duty on pipeline companies to protect landowners' property burdened by the pipeline companies' servitudes from erosion where their pipelines run through canals that the companies have chosen to leave on the property unfilled? The proposed class is composed of a limited and objectively ascertainable group of property owners subject to Defendants' rights-of-way ("ROWs").[2] The injunctive relief to which the class is entitled will automatically flow from the Court's findings on these common legal and factual issues. And, to the extent that the class might be entitled to additional or alternative monetary relief, it will not require the introduction of new and substantial legal or factual issues, entail complex individualized determinations, nor require additional hearings to resolve disparate merits of each individual class member's case; rather, such damages are capable of computation by means of objective standards, and are not dependent in any significant way on the intangible, subjective differences of each class member's circumstances.[3, 4]

Accordingly, Bradish Johnson seeks an order (1) determining that this action is maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2), and/or alternatively under 23(b)(1) or (b)(3); (2) appointing Bradish Johnson as class representative; and (3) appointing the undersigned counsel as class counsel pursuant to Fed. R. Civ. P. 23(g).

## I.  Overview of Plaintiff's Claims: Facts Common Across the Class

Bradish Johnson's claims against Defendants Tennessee Gas Pipeline Company, L.L.C. ("TGP") and Kinetica Energy Express, LLC ("Kinetica"), seek to redress a systemic injury caused by the Defendants' systemic conduct in the face of their systemic knowledge, requiring a systemic

---

[2] *See id.*
[3] *Cf. Allison v. CITGO*, 151 F.3d 402, 415 (5th Cir. 1998).
[4] *See* Lopez Aff., at ¶ 14; *see also* Affidavit of Mitchell Andrus, Ph.D., P.E. ("Andrus Aff.") (**Exh. B** hereto), at ¶¶ 6-10.

solution. In short, the Defendants and their predecessor-in-interest, Tennessee Gas Transmission Company ("Tennessee Gas"), knew before they constructed a network of pipeline canals through Louisiana's pristine coastal wetlands—and then made (and continue to make) the choice to leave those canals on the property unfilled—that those canals would require maintenance, protective measures such as bulkheads and dams or plugs, and periodic repairs in order to prevent those canals from eroding and from causing further erosion of the wetlands through which they run.[5] Tennessee Gas, TGP, and Kinetica nevertheless have made decisions on a system-wide basis to minimize and even eliminate the steps they would take to protect against the erosion they knew would otherwise occur; and that erosion then did occur and continues to occur. To redress this erosion, a system-wide remedy is needed, consistent with Louisiana's Coastal Master Plan.[6] Tennessee Gas did not construct the pipeline canals at issue on a tract-by-tract basis; its knowledge (and TGP's and Kinetica's knowledge) of the effects of the failure to properly maintain the canals is not confined to a tract-by-tract basis; and the solution to the erosion would not be most efficacious if confined to a tract-by-tract basis. Class treatment is the proper means to address these claims.

### A. The Pipeline Canals Were Constructed as Part of a System, Subject to System-Wide Knowledge that Unprotected Canals Would Erode

In the mid-1950s, to "assur[e] uninterrupted service to [its] customers thousands of miles away," Tennessee Gas brought "modern pipeline technology . . . to the lonely, watery world of south Louisiana."[7] This modern technology came in the form of the "Muskrat Line," touted as "the biggest construction project ever seen in Southeast Louisiana."[8] Historian Jason Theriot wrote, "In

---

[5] Lopez Aff., at ¶¶ 7, 10.
[6] *Id.* at ¶ 14; Andrus Aff., at ¶¶ 6-10.
[7] "Making of the Muskrat Line" video transcript, attached as Exh. 5 to TGP 1442 Deposition of Thomas Hutchins (January 30, 2024) ("Hutchins Depo.") (video transcript attached hereto as **Exh. C**; Hutchins Depo. attached hereto as **Exh. D**), at 11.
[8] "Through Marsh and Swamp," *The Line*, Vol. 11, No. 4 (April 1956), at 2-5 (**Exh. E** hereto).

the mid-1950s, [Tennessee Gas] made history with its 355-mile natural gas-gathering system built from south central Louisiana, across nearly impassable marshlands, treacherous swamps, and shallow bays to reach the Mississippi River delta."[9] The line was the first large-scale 24-inch diameter natural gas pipeline built through coastal Louisiana, and the techniques it employed became the model for other natural gas pipelines through the marsh.[10] One of the three lines at issue in this suit—the TGP 500-1—comprises the Muskrat Line; a second, the TGP 500-2, constructed a few years later, runs parallel to much of the Muskrat Line and then reaches other production areas to gather more natural gas to route to customers in the Northeastern United States; and the third line, the TGP 527A-100, was constructed as part of the same gas gathering system using the same methods pioneered for the Muskrat Line.[11] All three traverse the Bradish Johnson property.[12] Kinetica and TGP each are successors-in-interest to Tennessee Gas and are the current owners and operators of portions of the TGP 500-2 (TGP) and the TGP 500-1 (TGP) and TGP 527A-100 (Kinetica) lines.

These pipelines were installed by the flotation canal method, with barges dredging 40-foot-wide and 8-foot-deep canals through the marsh and laying the pipeline in a trench along the bottom of the canals.[13] In 1955, prior to commencing construction, Tennessee Gas knew that routine maintenance and protective structures such as plugs, dams, and bulkheads were necessary to prevent saltwater intrusion, boat traffic, and erosion. In October 1955, correspondence between Tennessee Gas and the Louisiana Wildlife and Fisheries Commission ("Commission") discussed

---

[9] Jason P. Theriot, *American Energy, Imperiled Coast: Oil and Gas Development in Louisiana's Wetlands* (LSU Press 2014), at 42.
[10] Deposition of Jason Theriot (Dec. 13, 2022) ("Theriot Depo."), at 82-38 (**Exh. F** hereto); *see also* Theriot, *American Energy*, *supra* n. 9, at 42.
[11] *See* Lopez Aff., at ¶¶ 4-6.
[12] *Id.* at ¶ 4.
[13] Larry F. Resen, "Swamps, Bays, Marshes Mark T.G.T. Muskrat Line R.O.W.," 54 OIL & GAS J. 53 (May 7, 1956) (**Exh. G** hereto).

the "long range [e]ffect or permanent change which may occur in the ecological and hydrographic characteristics"[14] due to construction of the Muskrat Line. In response, a representative of Tennessee Gas agreed to plug its proposed pipeline canal to prevent saltwater intrusion.[15] Tennessee Gas represented to the Commission that "[a]ll navigable canals will be dammed and these plugs will also be maintained by our people."[16] Tennessee Gas's "going in" plan was to install 240 plugs and bulkheads at crossings with other water bodies to prevent saltwater intrusion, deter access, and guard against erosion.[17] A 1956 promotional video regarding the Muskrat Line indicated that "165 bulkheads and 75 plugs were built to prevent erosion and saltwater intrusion into the marshland," and that "[r]outine maintenance is now the order of the day as it is along the thousands of miles of the Tennessee Gas Transmission system."[18]

In its January 15, 1956, construction contracts for the Muskrat Line, Tennessee Gas directed its contractor to install plugs "where pipeline crosses existing streams, bayous, sloughs, canals or other waterways."[19] The contract further provided that plugs "will be of sufficient depth to insure stability and prevent infiltration of water either in or out of floatation ditch."[20] Regarding bulkheads, the construction contract provided, " . . . [T]he floatation ditch will be plugged with a timber bulkhead spanning across the said ditch and extending twenty (20) feet along the bank line

---

[14] La. Wildlife & Fisheries Comm'n Meeting Minutes, October 24-25, 1955 (**Exh. H** hereto), attached as Exh. 15 to Hutchins Depo., at 24.

[15] *See id.* at 26-27.

[16] *Id.* at 33.

[17] Hutchins Depo., at 309; *see also* Deposition of George Benoit (12/19/2019) ("Benoit Depo.") (**Exh. I** hereto), at 20-21 (explaining that the purpose of plugs and bulkheads was to prevent access by boats that would cause erosion).

[18] "Making of the Muskrat Line" Transcript, at 12 (emphasis added); *see also* Theriot, *American Energy*, *supra* n. 9, at 68; Benoit Depo., at 30; Theriot Depo. at 110-116.

[19] January 15, 1956, Construction Contract (**Exh. J** hereto), attached as Exh. 18 to Hutchins Depo., at Henican_TGP_004568; *see also* Resen, *supra* n. 13, at 53 ("Once the pipe has been laid and covered in the trench, the canal will be dammed at each intersecting bay or waterway to prevent changing the channel flow to guard against erosion and to prevent saltwater intrusion into the marshes."); Glenn Thompson, "Right-of-Way Acadian Style," *The Line*, Vol. 15, No. 5, at 9 (**Exh. K** hereto) ("To minimize this damage, the Company constructs rock plugs and other types of water control structures at points where pipeline canals intersect natural waterways, preventing drainage of marsh land and erosion by tidal action.").

[20] Construction Contract at Henican_TGP_004569.

of the existing waterway on each side of the floatation ditch. The floatation ditch will be backfilled behind the timber bulkhead with either soil or shell."[21] After construction, the pipeline companies have used the canals they chose to leave unfilled, to enable maintenance and inspections of the pipeline; as explained in the 1956 promotional video, "[T]he crews move by boat and float plane. The plane patrols the entire district keeping a close watch on the line. The flotation canal is used for landing in places otherwise inaccessible."[22]

Then, in 1972, Tennessee Gas co-sponsored a study entitled "Environmental Aspects of Gas Pipeline Operations in the Louisiana Coastal Marshes" ("the 1972 Battelle Report").[23] The 1972 Battelle Report was not formulating new opinions or data on the effect of pipeline canals in Louisiana's wetlands, but was "documenting the existing knowledge on the environmental effects of gas pipeline operations in the marshlands" and "[f]ormulating general conclusions, based upon the present state of knowledge, of the impacts of developments following the offshore lease sales."[24] The report specifically included "canal maintenance" and "[f]ill and berm maintenance" as within the matrix of "Gas Pipeline Industry Activities."[25] The 1972 Battelle Report recognized that "[l]and loss due to canaling is a matter of serious concern in Louisiana."[26] The 1972 Battelle Report provided that, "if bulkheads and dams are not maintained they can wash out around the end permitting water flow, and inspection and maintenance is required to ensure that these continue to fulfill their designed function."[27] The 1972 Battelle Report expressly found that consequences of pipeline canaling in coastal marshlands include vegetational loss directly related to the width of

---

[21] *Id.*
[22] "Making of the Muskrat Line" Transcript, at 12; *see also* Benoit Depo., at 83.
[23] 1972 Battelle Report (**Exh. L** hereto), attached as Exh. 10 to Hutchins Depo.
[24] *Id.* at 1.3.
[25] *Id.* at 1.5, 1.6.
[26] *Id.* at 3.2.
[27] *Id.* at 3.9 (emphasis added).

the pipeline ditch or canal[28]; "[m]ore or less permanent alteration of landscape; greater loss of land"[29]; change in drainage patterns "depending on use of bulkheading"[30]; changes in salinity, especially within pipeline canals that are not bulkheaded or dammed[31]; and worsened flooding and storm conditions, among a litany of other effects.[32] The information developed by the 1972 Battelle Report "should be applicable to developments involving all marshland types."[33]

The 1972 Battelle Report emphasized that the effects of pipeline canals should not focus on discrete units, but instead should analyze the entire coastal marshlands as an ecosystem:

> [I]t is important to remember that the coastal marshlands represent a continuous unit in time and space, i.e., we are dealing with an ecosystem. As Gates has noted, 'the complexity of an ecosystem is enormous for, by definition, it is the total sum of the organisms, the environment, and the processes of interaction between and within all parts of the system.' By concentrating our efforts on discrete factors, we may be ignoring important parts of the system or minimizing subtle but significant interactions.[34]

Indeed, TGP's representatives have testified that the 240 plugs and bulkheads in the "going in" plan for the Muskrat Line were designed to work to prevent erosion and control access to the pipeline canal as a whole system, not on a property-by-property basis.[35]

### B.    The Pipeline Companies Nevertheless Engaged in Protection Measures on the Cheap, and then Abandoned them Altogether for Cost Reasons

Even before completing construction of the Muskrat Line, Tennessee Gas realized that maintaining the plugs and bulkheads would be a constant and costly endeavor, and sought to make changes to the design parameters of the bulkheads to minimize these costs:

---

[28] *Id.* at 3.16.
[29] *Id.* at 3.8.
[30] *Id.*
[31] *Id.* at 3.15.
[32] *Id.*
[33] *Id.* at 1.3.
[34] *Id.* at 3.1.
[35] 1442 Deposition of TGP through Cy Harper (April 4, 2024) ("Harper Depo.") (**Exh. M** hereto), at 361-62.

Our instructions were to build a line that would require the minimum of maintenance from an operating standpoint. Mr. Brooks and myself made our approach to various large landowners with this in mind.

In our initial meetings with Mr. Frank Ritchie of LL&E, he asked for timber bulkheads with 300 feet of soil plug. After discussing this problem with various pipe line companies who have been operating in this area for many years, I asked Mr. Ritchie if he would consider Tennessee using Oyster shell for plug material in view of the complexity of obtaining soil for the initial construction and the constant and extremely costly [sic] maintenance problem of returning to rebuild these plugs. Tide and wave actions will eventually remove soil from the bay or bayou side of the timber bulkhead and difference in head of water on each side can mean losing the bulkhead, which would be indeed costly from an operating standpoint.[36]

Less than one year after construction of the Muskrat Line, a category 1 hurricane "wash[ed] many of these plugs away."[37] Erosion of the canals was observed continuing throughout the 1960s.[38] Despite the deteriorating conditions, which TGP recognized, in 1966 it made the decision to take "no corrective measures" to address these washouts unless affirmatively asked by a landowner or directed by an agency.[39] The continuing erosion of the pipeline canals and harm to the surrounding Louisiana marsh was detailed in the 1972 Battelle Report commissioned by Tennessee Gas and others six years after the decision was made. Nevertheless, "there was no policy change as a result of the Battelle study. . . . It didn't drive a change in the Tennessee Gas policy."[40] TGP's representative has testified that he was "not aware of us taking efforts to minimize erosion once that pipeline was in service . . . ," even though Tennessee Gas and its successors were aware of the technology to guard against erosion and prevent access to the canals.[41] Tennessee Gas and its successors stopped maintaining and rebuilding the erosion-control and access-control

---

[36] TGP Memo to La. Land & Expl. Co. (May 19, 1956) (**Exh. N** hereto).

[37] Theriot, *American Energy*, *supra* n. 9, at 68.

[38] Lewis G. Nichols, "Erosion of Canal Banks on the Rockefeller Wildlife Refuge," La. Wildlife & Fisheries Comm'n, Refuge Div. (April 3, 1961) (**Exh. O** hereto); *see also* Theriot Depo., at 246-47 (re Nichols study).

[39] TGP Memo re: Plug Study from Wax Lake Outlet to the East (May 17, 1966) (**Exh. P** hereto).

[40] Hutchins Depo., at 248-49.

[41] Deposition of Thomas Hutchins (May 2, 2017) ("2017 Hutchins Depo.") (**Exh. Q** hereto), at 180, 325-26).

structures; as of today, only about 17% of the waterway intersections along the three pipelines contain intact protective structures.[42]

In 1975, Tennessee Gas was again part of a pipeline industry group that commissioned another study of pipeline canal effects in Louisiana's wetlands by Battelle Laboratories ("the 1975 Battelle Study").[43] The 1975 Battelle Study emphasized the necessity of not just individual intact control structures, but of having a functioning system of intact control structures, because individual structures one waterway crossing are not effective if the next crossing is uncontrolled.[44] As Bradish Johnson's retained expert, John Lopez, Ph.D., summarized the Study's findings,

> The TGP-sponsored report prepared by Battelle in 1975 recognized this functional distinction and its essential importance to canal maintenance.[45] Their research on the 500-2 pipeline canal near Cocodrie, La. (Terrebonne Parish) compared a "closed" canal segment to an "open" canal segment. The "closed" canal had two intact protective structures isolating a segment of the 500-2 pipeline canal. Neither the "open" or "closed" segments were backfilled. The closed segment is described as only allowing "*seepage through the bulkheads and the marsh.*" The "open" canal segment on 500-2 had one intact protective structure but without a protective structure at the other end, so it was open to water exchange.
>
> The study found that the "closed" canal with two nearby protective structures had "*approximately the same width as when dredged.*" That is, the "closed" canal had not widened post-construction. In stark contrast, the "open" canal with one intact structure had widened by as much as 30 feet in just a few years. They concluded the erosion in the "open" canal, even with one intact protective structure, was due to tidal currents, storm surges, and limited boat traffic.
>
> Because of their observations of a closed canal with multiple protective structures, they concluded, *"Battelle's research at Cocodrie shows that bulkheads reduce erosion and loss of marshland along canals because they reduce tidal movement and inhibit wave action from boat traffic (a major cause of canal erosion)."* In general, Willingham (1975) concluded, "*Closed canals will erode the least.*"
>
> It was always logical that any canal with a single intact structure may still be "open" and subject to the exact processes protective structures were intended to stop, but

---

[42] Lopez Aff., at ¶¶ 9-11; *see also* Theriot Depo., at 114-15 and 270-73.

[43] Lopez Aff., at ¶ 10.

[44] *Id.*

[45] Willingham, C.A., et al. 1975. "Final Report on A Study of Selected Coastal Zone Ecosystems in the Gulf of Mexico in Relation to Gas Pipelining Activities." Prepared by Battelle, for Offshore Pipeline Committee.

TGP's study demonstrated that a truly closed canal with functional and intact protective structures was 100% effective in preventing widening. TGP knew forty-nine years ago that protective structures needed to be intact and functional to create "closed" canals in order to prevent canal widening and land loss. [46]

Because of the high cost of maintaining the erosion-control structures, TGP developed a practice of taking no steps to maintain or repair them unless threatened with a lawsuit, even for ROWs with express bulkhead maintenance requirements, and declined to budget sufficient funds to repair bulkheads, as reflected in a 2017 email from TGP's Rick Sellers:

> . . . Item 5: TGP is going to be responsible for the ongoing/future maintenance of the bulkheads on either side of Bayou Penchant for the life of the proposed Pipeline Abandonment Permit. Just so you know, this provision is written into our existing 1956 agreements with CLF, LL&E and Miami Corp and I don't recall maintaining any unless the land owner actually threatens a lawsuit. Kurt told me that he used to request budget $$$ each year to make repairs to the existing bulkheads and that his request was normally denied.[47]

The "Kurt" referred to in the email was Kurt Cheramie, who in a recent deposition testified that regular maintenance of bulkheads in the pipeline canals, system-wide, was routinely deferred because there were not enough funds budgeted to perform the work, delaying it for years, resulting in continued deterioration of the structures over time.[48] TGP's internal documents show that not only were funds "deferred" for maintenance work on bulkheads due to a lack of sufficient fund being budgeted for this work, but the limited funding that was budgeted was routinely pillaged to fund other work, such as work on valves that assist TGP in moving product through the pipelines so that it can ultimately be sold.[49]

---

[46] *Id.*
[47] Email from Rick Sellers (Oct. 20, 2017) (**Exh. R** hereto).
[48] Deposition of Kurt Cheramie (May 10, 2024) ("Cheramie Depo.") (**Exh. S** hereto), at 16, 41-44, 55-58.
[49] *See* Various emails related to bulkhead funds being reallocated for other projects (*in globo*, **Exh. T** hereto).

**C.    The Anticipated Erosion Damage Has Occurred, and Continues, Along the Entire Pipeline System, Requiring a Systemic Solution**

Bradish Johnson's expert, Dr. Lopez, has conducted flyovers and analyses of the entire run through Louisiana's wetlands of the three pipelines at issue, and has concluded that there is significant widening along nearly all of the pipeline canals.[50] The aerial footage he has captured shows that there is no distinction of the erosion problems from one property owner's tract to the next, but that the land-loss has occurred systemically:

> Aside from the land loss due to canal widening, other processes related to the flotation canals associated with the Defendants' Pipelines are likely to be active and further contribute to additional marsh loss or degradation. The erosion of the bank of a single pipeline canal, the lack of intact and functional protective structures at a tidally connected waterbody, the merging of multiple pipeline canals, the structural failures of protective structures, and the widening around protective structures, all unnaturally contribute to increasing in hydrologic connectivity of the flotation canals associated with Defendants' Pipelines, the adjacent water bodies, and the intertidal marsh. The increased hydrologic connectivity increases the permeability of an estuarine marsh. This increases the tidal prism and the potential for erosion and sediment transport, leading to the additional conversion of the marsh to open water, further exacerbating the hydrologic connectivity and deleterious conditions.[51]

Historian Jason Theriot confirmed that Tennessee Gas knew that these hydrologic impacts would occur without proper maintenance and repair of protective structures and measures.[52] Tennessee Gas's knowledge of these impacts was documented extensively in the 1972 Battelle Report and the 1975 Battelle Study, and was contained in its documents, communications, and records prior to and at the time of construction. The pipeline companies observed the canal erosion during their regular aerial inspections[53]; but, as confirmed in the 2017 emails and Mr. Cheramie's testimony, they never budgeted sufficient funds to address and repair the canals and bulkhead structures.[54]

---

[50] Lopez Aff., at ¶¶ 5, 8.
[51] *Id.* at ¶ 12.
[52] Theriot Depo., at 112-16, 195-96, 205-11, 242-44, 246-248, 253.
[53] Benoit Depo., at 60, 88-89.
[54] Cheramie Depo., at 16, 41-44, 55-58.

3892898v1

Ultimately, the most efficacious solution for the canal widening and the land erosion caused by TGP's and Kinetica's systemic abdication of their duty to protect the landowners from damage to the land subject to their pipeline ROWs and the systemic erosion of that land is a systemic application of a common suite of restoration measures consistent with Louisiana's Coastal Master Plan.[55] As Dr. Lopez attests, "The Louisiana land loss crisis extends across all political, geologic, and biologic boundaries. The collective ecosystem across the coast is profoundly threatened by the loss of wetlands and increasingly compromised processes that support healthy and resilient wetlands."[56] He continues, "Solutions considered in isolation are tempting but ultimately run the risk of inefficiency, non-functionality, or conflicting results."[57] He concludes that a system-wide restoration strategy "[u]sing an integrated, synergistic approach to restoration" based on the project arrays in the Louisiana Coastal Master Plan is the most efficacious solution.[58] Bradish Johnson's retained engineering expert, Mitchell Andrus, Ph.D., concurs, opining as follows: "Designing sustainable restoration in the working coast relies on integration of project area conditions and standard engineering approaches. Numerous restoration projects have been successful using the set of proven project types outlined in the Coastal Master Plan. A systemic plan to restore the land impacted by Defendants' pipeline operations and prevent future land loss will be beneficial across the landscape occupied by Defendants' pipelines."[59]

## II.    The Common Set of Legal Duties Applicable to the Defendants' Choice to Leave the Pipeline Canals on The Property Unfilled

TGP's and Kinetica's principal rights to maintain, inspect, and operate their pipelines, which include the accessory right to exercise that principal right within canals that they choose to

---

[55] Lopez Aff., at ¶ 14; *see also* Andrus Aff., at ¶¶ 6-10.
[56] Lopez Aff., at ¶ 14.
[57] *Id.*
[58] *Id.*
[59] Andrus Aff., at ¶ 6.

leave on the property unfilled, exist either pursuant to ROW agreements such as those on the Bradish Johnson property or pursuant to expropriation judgments. Regardless which means they gained those principal and accessory rights, however, they are all servitudes subject to "a whole host of suppletive rules" from the Louisiana Civil Code "that govern the relationship of parties to a servitude to the extent that they . . . do not provide otherwise." *Rose v. Tenn. Gas Pipeline Co.*, 508 F.3d 773, 777-78 (5th Cir. 2007).

The servitudes at issue are personal "right of use" servitudes. *See id.* at 777 n.13; *see also Parkway Dev. Corp. v. City of Shreveport,* 342 So. 2d 151, 154 n.2 (La. 1977). As such, they are subject to Civil Code article 645, which provides, "A right of use is regulated by application of the rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing a right of use servitude." LA. CIV. CODE art. 645.[60] These rules in the Civil Code articles governing usufructs and predial servitudes are the suppletive rules applicable to personal servitudes of rights of use. Thus, TGP's and Kinetica's obligations are subject to a common set of legal duties, regardless of the particular terms of a ROW or expropriation judgment.

## A.    Civil Code Suppletive Rules Apply Where the Servitude Instrument is Silent as to Exoneration from those Rules

The Louisiana Supreme Court has held, "A suppletive rule . . . applies only if those affected by it ***have not excluded its application***." *E.L. Burns Co. v. Cashio*, 302 So. 2d 297, 300 (La. 1974) (emphasis added); *see also Taranto v. La. Citizens Prop. Ins. Co.*, 10-105 (La. 3/15/11), 62 So. 3d 721, 733. Here, TGP's Cy Harper has testified that not one Tennessee Gas ROW agreement

---

[60] While the personal servitude of right of use was codified in the Civil Code in 1977, prior to that time Louisiana courts applied both predial servitude articles to such arrangements, as seen in *Farrell v. Hodges Stock Yards, Inc.*, 343 So. 2d 1364, 1371, n.6 (La. 1977), and the usufruct articles. *See Faulk v. Union Pac. R. Co.*, 2014-1598 (La. 6/30/2015), 172 So. 3d 1034, 1047-48 ("Notably, however, the counterpart to current LSA-C.C. art. 645 . . . was former Article 628 (in effect in 1888, 1889, and 1910 when the deeds at issue were executed), which provided only: 'The rights of use and habitation are established and extinguished in the same manner as usufruct.'").

contains provisions regarding maintenance of canal banks,[61] meaning that they are silent as to the duties—or exoneration from those duties—to protect the landowners' property from erosion. Because the parties did not exclude the application of the law that covers personal servitudes of rights of use, they must obey that law.

In *Terrebonne Parish School Board v. Columbia Gulf Transmission Co.*, 290 F.3d 303 (5th Cir. 2002), the Fifth Circuit held that, absent language in a pipeline ROW expressly contemplating canal erosion, the duty to maintain pipeline canals requires an examination of the applicable suppletive rules under the Louisiana Civil Code, reading these rules into the ROWs at issue. *Id.* at 312-14. "[A]bsent an express contractual exoneration for marsh erosion damages, to the extent that the damage to the servient estate was caused by abuse of right, the damage should be compensable." *Id.* at 316 (footnotes omitted). Notably, in *Columbia Gulf*, there were two different ROWs at issue, one that contained an express width measurement for the canals and one that made no mention of a width requirement for the canals. *Id.* at 308 (quoting provisions of a Koch ROW that provided that canals are "not to exceed forty feet in width" and provisions of a Columbia Gulf ROW with no such provision). Accordingly, the *Columbia Gulf* court applied the servitude law from the Civil Code regardless of differences in the particular ROWs.

Whether a particular servitude agreement or expropriation judgment has a specific width limitation is not the ultimately determinative factor—hence, there was no need for the *Columbia Gulf* court to examine that difference in the ROWs before it—because the accessory right of leaving a canal unfilled is already limited by the primary purpose of the pipeline servitude, which is common across all the pipeline servitudes. In *St. John the Baptist Parish v. State, Department of Wildlife & Fisheries*, 05-1002 (La. App. 5 Cir. 10/17/2006), 943 So. 2d 1209, the Parish

---

[61] Harper Depo., at 299-300.

had a right-of-use servitude across land owned by the Department of Wildlife and Fisheries ("LDWF") for purposes of constructing, operating, and maintaining a drainage canal. *Id.* at 1209. The Court held that the Parish could only use the canal and its banks for those activities reasonably necessary to the limited purpose stated in the agreement, and that the Parish had no right to maintain and lease out hunting and fishing camps within that right of way that were unrelated to the purpose of the servitude. *Id.* at 1215. The court in *St. John the Baptist Parish* relied on fundamental precepts of the Civil Code articles applicable to personal servitudes of right of use:

> A right of use includes the rights contemplated or necessary to enjoyment at the time of its creation as well as rights that may later become necessary, provided that a greater burden is not imposed on the property unless otherwise stipulated in the title. La. C.C. art. 642. Rights that are necessary for the use of a servitude are acquired at the time the servitude is established. La. C.C. art. 743. They are to be exercised in a way least inconvenient for the servient estate. La. C.C. art. 743.

*Id.* Here, TGP's and Kinetica's primary purposes of the pipeline servitudes are the construction, operation, inspection, and maintenance of their pipelines, and at the time of entering into the servitudes Tennessee Gas (TGP's and Kinetica's predecessor-in-interest) therefore acquired the accessory right of dredging a canal that it could leave unfilled as necessary to enjoyment of that principal purpose. But, as the *St. John the Baptist Parish* decision illustrates, TGP and Kinetica are not entitled to allow later circumstances to cause that accessory right of leaving the canal unfilled to impose a greater burden on landowners' property. Accordingly, by choosing to leave canals unfilled, TGP and Kinetica are charged with the obligation to not allow their continuing exercise of that accessory right to burden landowners' property in a manner that is unnecessary to the primary purpose of maintaining and operating the pipelines. Louisiana courts have long held that, "in those instances where the width of a ROW was not specified in the instrument establishing a servitude, the grant would be limited to a width necessary for an excavation adequate to receive the pipeline." *Tex. E. Transmission Corp. v. Terzia*, 138 So. 2d 874, 876 (La. App. 2d Cir. 1962).

In *Rose*, the Fifth Circuit remanded a pipeline canal erosion case to the district court to determine "whether the judgment of expropriation [that had created the pipeline servitude] **disposed of** any applicable provisions or whether the parties did or did not **contract out** of Louisiana's law on servitudes." 508 F.3d at 778 (emphasis added and internal quotation marks and citations omitted). On remand, the district court confirmed, "[T]he Court need not examine the 1964 judgment to determine whether it imposed an affirmative duty on TGP to maintain the pipeline canal. . . . Rather, the determinative question is whether the judgment, by its terms, **relieved TGP of the duties otherwise imposed by law**." *Rose v. Tenn. Gas Transmission Co.*, 2008 WL 11353629, at *4 (E.D. La. Nov. 12, 2008) (emphasis added).

In another Fifth Circuit decision, the court denied relief to the landowner, but under a rationale that further illustrates that any exoneration from the suppletive rules must be express. In *Ryan v. Southern Natural Gas Co.*, 879 F.2d 162 (5th Cir. 1989), the parties to the ROW had expressly provided that the pipeline company would not have to construct dams or backfill to address erosion, *id.* at 165 ("… the contracting parties turned their attention to whether SNG would be required to construct dams in the canal and SNG was successful in negotiating an agreement that **relieved it of this responsibility."**) (emphasis added); and they had contemporaneously executed a letter agreement that specifically contemplated the potential for canal erosion and released SNG from such damages. *See Ryan v. Southern Natural Gas Co.*, 1987 WL 19044, at *2 (E.D. La. Oct. 27, 1987). In *Ryan,* the side-letter was the express exoneration from suppletive rules that was missing in *Columbia Gulf* and *Rose*; the Fifth Circuit in *Columbia Gulf* expressly noted that the ROW provision that a canal could be "left open" (*i.e.*, that the canal would remain on that property and not be refilled)—which was in the ROWs in both *Columbia Gulf* and in *Ryan*, was not the operative provision in determining

16

if the pipeline companies had been exonerated of their duties to obey the applicable law. *See Columbia Gulf*, 290 F.3d at 315 & n.27 ("The best factual support for our *Ryan* holding was *not* the servitude agreement's provision . . . that the pipeline canal could be left 'open,' but rather, as the district court noted, the pipeline owner's signature on and the landowner's acceptance of a 'letter agreement' that bound the former to pay the latter $400 per acre of land encroached on by the canal in the event it widened.").[62] The question is not whether the pipeline companies may leave the canal unfilled on the property, but what obligations are triggered by their exercise of the option to leave those canals unfilled on the property.

In the *Vintage Assets* case, the Louisiana Fourth Circuit Court of Appeal also examined ROWs, some of which contained "not to exceed" language and some that did not, and recognized that the use and extent of those servitudes is governed by the Civil Code's "'whole host of suppletive rules that govern the relationship of parties to a servitude to the extent that they . . . do not provide otherwise.'" *Vintage Assets, Inc. v. Tenn. Gas Pipeline Co.*, 2020-C-0066 (La. App. 4 Cir. 3/26/2020) (regarding ROWs without measurement language), at 3-4 (quoting *Rose*, 508 F.3d at 778), *quoted in Morgan City Land & Fur Co. v. Tenn. Gas Pipeline Co.*, 2020-676 (La. App. 4 Cir. 4/21/2021), 319 So. 3d 437, 449-50 & n.15; *see also Vintage Assets, Inc. v. Tenn. Gas Pipeline Co.*, 2020-C-0065 (La. App. 4 Cir. 3/19/2020) (regarding ROWs with measurement language), *also quoted in Morgan City Land*, 319 So. 3d at 449. The *Vintage Assets* Fourth Circuit decisions held that the suppletive rules requiring use of the property subject to the servitude in a manner so as not to unreasonably injure the rights of the landowner and in a manner "least inconvenient" and causing the "least possible damage" to

---

[62] The *Columbia Gulf* court also addressed the decision in *St. Martin v. Quintana Petroleum Corp.*, rejecting the vitality of the analysis in *Quintana* as a mis-application of *Ryan*, which the *Columbia Gulf* court noted was distinguishable due to the side-letter agreement expressly exonerating the pipeline company there from having to take measures to control erosion. 290 F.3d at 324-25.

the servient estate were applicable to pipeline servitudes regardless whether there were express width limitation in the ROWs. *Id.*

### B.    Louisiana's Suppletive Rules Require TGP and Kinetica to Maintain Canals and Protect them Against Damage to Class Members' Property

It is axiomatic that the law existing at the time of a contract's confection is the law that governs the rights and obligations of the parties. *See, e.g.*, *Oil Well Supply Co. v. N.Y. Life Ins. Co.*, 38 So. 2d 777, 788 (La. 1949). An analysis of the development of the full panoply of applicable Civil Code articles from the Civil Code of 1870—applicable at the time these lines were constructed and the rights to construct them were granted—through the current articles, shows how well-entrenched the legal concepts applicable to these servitudes are. As noted, Civil Code article 645 codified that right of use servitudes are governed by the Civil Code articles applicable to usufructs and predial servitudes, as they had been prior to the enactment of article 645.[63] Accordingly, both usufruct and predial servitude Civil Code articles provide the universe of suppletive rules applicable to the pipeline servitudes.

The foundational Civil Code article applicable to servitudes provides that "[d]oubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate." LA. CIV. CODE art. 730 (reproducing the substance of art. 753 of the Civil Code of 1870). That is the case here, where the question of the extent of the canals allowed under the servitudes obtained for the pipelines at issue, as well as the manner of the exercise of rights related to the canals, is not otherwise provided for.

Current Civil Code article 743 provides, "Rights that are necessary for the use of a servitude are acquired at the time the servitude is established. They are to be exercised in a way ***least inconvenient*** for the servitude estate." LA. CIV. CODE art. 743 (emphasis added); *see also* LA. CIV.

---

[63] *See Farrell*, 343 So. 2d at 1371 n.6; *Faulk*, 172 So. 3d at 1047-48.

CODE of 1870 art. 771 (precursor to current Civil Code art. 743). Accessory rights—such as the right to dredge canals and leave them unfilled, which is necessary for the primary use of constructing, operating, inspecting, and maintaining the pipelines—may not impose a greater burden on the property owner than that required for the originally stated purpose of the servitude. *See* LA. CIV. CODE art. 642 ("A right of use includes the rights contemplated or necessary to enjoyment at the time of its creation as well as rights that may later become necessary, provided that a greater burden is not imposed on the property unless otherwise stipulated in the title.").

Additionally, Civil Code article 745 provides,

> The owner of the dominant estate has the right to enter with his workmen and equipment into the part of the servient estate that is needed for the construction or repair of works required for the use and preservation of the servitude. He may deposit materials to be used for the works and the debris that may result, ***under the obligation of causing the least possible damage*** and of removing them as soon as possible.

LA. CIV. CODE 745 (emphasis added); *see also* LA. CIV. CODE of 1870 art. 774 (precursor of current LA. CIV. CODE art. 745); *see also Columbia Gulf*, 290 F.3d at 316 n.32; *Rose*, 508 F.3d at 778 n.17.

Additionally, multiple courts have cited to Professor Yiannopoulos's discussion of the aggravation of a servient estate, quoted prominently in *Columbia Gulf*: "[T]he ***duty not to aggravate the condition of the servient estate***, 'correlative of the real right of servitude, is not grounded on negligence[.]'" 290 F.3d at 316 (emphasis added) (quoting 4 A.N. Yiannopoulos, La. Civ. L. Treatise: Predial Servitudes § 156 (West 1997)); *see also Rose*, 508 F.3d at 778 n.18. This portion of Professor Yiannopoulos's treatise was referring to article 778 of the Civil Code of 1870, which provided,

> On the other hand, he who has a right of servitude ***can use it only according to his title, without being at liberty to make*** either in the estate which owes the servitude, or in that to which the servitude is due, ***any alteration by which the condition of the first may be made worse.***

LA. CIV. CODE of 1870 art. 778 (emphasis added). Where the servitude instrument provides that the principal purpose for the canals is to construct, operate, inspect, and maintain the pipelines—and TGP and Kinetica choose either to do nothing to maintain those canals and prevent erosion of the canals or they choose methods of inspection, maintenance, and operation of those canals that they knew would be ineffective to protect the class members' property from damage—the use of the servitude is altered beyond the title and worsens the condition of the landowners' servient estates. Notably, the federal court in *Vintage Assets* held that such erosion of the canals was "self-evident" aggravation of the servient estate. *Vintage Assets, Inc. v. Tenn. Gas Pipeline Co.*, 2017 WL 3601215, at *7 (E.D. La. Aug. 22, 2017), *vacated on jurisdictional grounds*, 2018 WL 6264375 (5th Cir. Oct. 3, 2018).

A plethora of additional Civil Code-provided suppletive rules are applicable to the servitudes at issue. Civil Code article 539 provides that a usufructuary "is bound to use [the things subject to the usufruct] as a prudent administrator and to deliver them to the naked owner at the termination of the usufruct." LA. CIV. CODE art. 539. Current article 539 is the successor to article 535 of the 1870 Code, which provided, "the usufructuary is bound to use [things subject to the usufruct] as a prudent administrator would do, ***to preserve them as much as possible***, in order to restore them to the owner as soon as the usufruct terminates." LA. CIV. CODE of 1870 art. 535 (emphasis added).[64]

---

[64] Current article 539's "prudent administrator" standard is not limited by the Mineral Code-specific "reasonably prudent operator" standard, an interpretation that would entirely ignore the broader property-law application of "prudent administrator." A "prudent administrator" in the usufruct context has been defined as one who is "required to take the same care of the property of which he enjoys the usufruct as though it were his own." *Bell v. Saunders*, 72 So. 729, 731 (La. 1916). This comports with the "preserve … as much as possible" requirement of prior article 535, and is the obligation provided to the ROWs by the suppletive law. *See also* LA. CIV. CODE of 1870 art. 567 ("It is the duty of the usufructuary to keep the things of which he has the usufruct, and to ***take the same care of them as a prudent owner does*** of what belongs to him. He is accordingly answerable for such losses as proceed from his fraud, default or neglect.") (emphasis added); LA. CIV. CODE art. 576 ("The usufructuary is answerable for losses resulting from his fraud, default, or neglect.").

Another key suppletive rule provided in the Civil Code is found in article 577:

> The usufructuary is responsible for ordinary maintenance and repairs for ***keeping the property subject to the usufruct in good order, whether the need for these repairs arises from accident or force majeure, the normal use of things, or his fault or neglect***. The naked owner is responsible for extraordinary repairs, unless they have become necessary ***as a result of the usufructuary's fault or neglect*** in which case the usufructuary is bound to make them at his cost.

LA. CIV. CODE art. 577 (emphasis added); *see also* LA. CIV. CODE of 1870 art. 571 (precursor to current art. 577, providing in part, "The usufructuary is bound to make such repairs as are indispensably necessary for ***keeping the estate subject to the usufruct in good order***.") (emphasis added). Accordingly, the duty to maintain the property to keep it "in good order" has been black-letter law, and an obligation of pipeline companies, since long before the servitudes at issue here were created. *See also* LA. CIV. CODE art. 581 ("The usufructuary is answerable for all expenses that become ***necessary for the preservation and use of the property*** after commencement of the usufruct.") (emphasis added); LA. CIV. CODE of 1870 art. 570 (precursor to current art. 581: "The usufructuary is liable to all the necessary expenses for the preservation and working of the estates subject to the usufruct.").

This body of current and historic Civil Code articles commonly applicable to all holders of personal servitudes of right of use sets forth clear duties to not aggravate the condition of the servient estate, to exercise accessory rights in the least inconvenient way possible, to conduct the use of the servitude in a manner so as to inflict the least possible damage, to preserve the property subject to the servitude, and to keep the servient estate in good order.

### C.    Neither *Castex* nor *Morgan City Land* Foreclose Reliance on Suppletive Rules

TGP has argued in other pipeline canal land-loss cases that the Louisiana Supreme Court's decisions in *Morgan City Land & Fur Co. v. Tennessee Gas Pipeline Co.*, 2021-704 (La. 10/12/2021), 325 So. 3d 1051, and in *Terrebonne Parish School Board v. Castex Energy, Inc.*, 893

21

So. 2d 789 (La. 2005), foreclose the imposition of any duties under the Civil Code's suppletive rules, but these arguments run aground on the actual holdings and facts of those cases.

In *Morgan City Land*, the state district court had denied the landowner's motion for summary judgment on duty in part, finding that there was no express obligation to maintain the canal widths; correspondingly, the district court had granted TGP's cross-motion in part upon that same finding that there was no obligation to maintain the canals and canal banks. *See Morgan City Land*, 319 So. 3d at 440. On appeal, the Fourth Circuit (1) found "that application of the suppletive articles imposes on [defendant pipeline companies] a duty not to aggravate Landowner's servient estate," but (2) held that "the question of whether any erosion beyond the limits set forth in the Measurement Provisions [of the ROWs] constitutes an aggravation of Landowner's servient estate is an inherently factual question inappropriate for summary judgment at this juncture." *Id.* The Louisiana Fourth Circuit reversed the summary judgment that the pipeline companies had no obligation to maintain the canals and canal banks. *Id.*

The pipeline defendants applied to the Louisiana Supreme Court for a writ of certiorari from the Fourth Circuit's decision, which the Louisiana Supreme Court only granted in limited part. The Supreme Court held that the Fourth Circuit "correctly found factual questions precluded summary judgment." 325 So. 3d at 1052. The Court held, therefore, that the Fourth Circuit did not need to "pass[] on the existence of a duty, an issue which is closely intertwined with the facts." *Id*. The Supreme Court expressly ***affirmed*** the Fourth Circuit's reversal of the district court's grant of partial summary judgment to the pipeline companies, then "vacated and set aside" the portion of the Fourth Circuit's decision discussing the existence of an implied duty. *Id.* The pipeline companies' writ application was denied "[i]n all other respects." *Id.* What were those "other respects"? The *Morgan City Land* Supreme Court ***did not:*** (1) hold that the suppletive law did not

apply; (2) hold that the pipeline companies did not have any implied obligations to maintain the canal widths; or (3) determine that suppletive law could not be used to impose on pipeline companies additional obligations not stated in the servitude contracts.

As to *Castex*, as a threshold matter, the conceptual framework of the Court's analysis actually supports, rather than conflicts with, the approach requiring application of the suppletive rules to pipeline servitudes. In *Castex*, the Court was examining the existence and extent of implied obligations of restoration held by mineral lessees. The Court "first consider[ed] the text of Mineral Code article 122," then the "'good administrator' standard of La. Civ. Code art. 2710, applicable to all leases." 893 So. 2d at 796-97 (emphasis added). The Court also examined the lease-specific Civil Code articles 2719 and 2720. *Id.* at 800. In applying these Mineral Code and Civil Code lease articles (*i.e.*, the suppletive rules applicable to mineral leases), the *Castex* Court looked to the **lease** rights from the Civil and Mineral Codes applicable to the **mineral lease** before it to determine the extent of obligations in that case; therefore, courts in pipeline servitude cases are correct to look to the **servitude** rights from the Civil Code applicable to the **pipeline servitudes** to determine the extent of pipeline companies' obligations.

Conceptually, the analytical framework is the same—but it would be a grave error to take that framework but then apply **lease** laws to **servitudes**. That's where *Castex*'s utility ends. *Castex* had nothing to do with the duties of a servitude holder under the Civil Code's suppletive rules applicable to servitudes. The servitude rights and obligations at issue here are not limited to property rights in the oil and gas industry, and these are not mineral rights cases. What is considered reasonable or prudent oilfield operations has no place in the law of servitudes of rights of use. Further, *Castex* is particularly uninstructive on any question of obligations where the defendant acted in excess of servitude boundaries. The *Castex* Court relied on the lack of any

allegations there that the mineral lessees had acted unreasonably or excessively. *Id.* at 801 (holding that there was no implied duty under Mineral Code article 122 to restore property to original condition "absent proof that the lessee has exercised his rights under the lease unreasonably or excessively."). The crux of the land-loss here is analyzed by Dr. Lopez, who attests that the canals being left unfilled and without functional protective structures by TGP and Kinetica have exceeded their constructed widths, beyond the extent necessary to achieve the express purpose of the ROW.

### D.    No Exoneration May Operate to Violate Public Policy Requiring Preservation and Restoration of Louisiana's Coastal Wetlands

Finally, even if there were an exonerating provision in a particular ROW or expropriation judgment, here no such exoneration could be effective if it violates established public policy that requires the preservation and restoration of Louisiana's coastal wetlands. In Civil Code article 729, part of the suppletive rules applicable to servitudes, "Legal and natural servitudes may be altered by agreement of the parties *if the public interest is not affected adversely*." (Emphasis added). The Revision Comments to Civil Code article 697 (which provides that "[t]he use and extent of [predial] servitudes are regulated by the title by which they are created, and, in the absence of such regulation, by the following rules") note that "[o]wners have the right to establish on their estate, or to acquire for the benefit of their estate, such predial servitudes as they deem proper," but that "[t]his freedom . . . is tempered by *rules of public policy* enacted in the general interest." LA. CIV. CODE art. 697 Rev. Cmt. (b) (emphasis added). These two Code articles form the basis for the ability of parties to a pipeline servitude to contract out of suppletive rule provisions through express exonerative language, as detailed above. They also, however, provide that the parties cannot contract out of suppletive rules where the result would be contrary to public interest or public policy. In the land-loss context, the Louisiana Supreme Court has held that a result that impedes restoration of wetlands loss would violate Louisiana's constitutionally enshrined public

trust doctrine; therefore, if any ROW or expropriation judgment contained terms purporting to exonerate pipeline companies from duties to keep their exercise of the accessory right to leave a canal unfilled from harming the landowners' property subject to that accessory right, those particular terms would not operate to destroy the common duty owed to all of the landowners.

Under the 1921 Louisiana Constitution, "The natural resources of the State shall be protected, conserved and replenished . . . . The Legislature shall enact all laws necessary to protect, conserve and replenish the natural resources of the State, and to prohibit and prevent the waste or any wasteful use thereof." La. Const. (1921) art. VI, § 1. This was given greater detail in the 1974 Louisiana Constitution:

> The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.

La. Const. (1974) art. IX, § 1. In his seminal public trust decision in *Save Ourselves, Inc. v. Louisiana Environmental Control Commission*, 452 So. 2d 1152 (La. 1984), then-Justice Dennis cited to both the 1921 and the 1974 constitutional provisions as embodying the public trust doctrine under Louisiana law. *Id.* at 1154. More recently, the Louisiana Supreme Court has referred to article IX, § 1, of the Louisiana Constitution as "enshrining[ing]" a "public policy of environmental protection" in the Louisiana Constitution. *State ex rel. Tureau v. BEPCO, L.P.*, 2021-856 (La. 10/21/2022), 351 So. 3d 297, 300.

In *Butler v. Baber*, 529 So. 2d 374 (La. 1988), involving claims by private oyster lessees against private mineral lessees for damage to their oyster beds caused by canal dredging, Justice Dennis issued a concurring opinion that this constitutional public trust doctrine could be applied to determine private duties as a law "enacted ***for the protection of the public interest***." *Id.* at 383 (Dennis, J., concurring) (emphasis added). In a subsequent oyster case, involving the question of

whether the LDWF was empowered by the public trust doctrine to include provisions in oyster leases to hold the state harmless for damages caused by wetlands restoration activities, the Louisiana Supreme Court held that reversing coastal loss is a rare area where both sides of the balance in the *Save Ourselves* "rule of reasonableness" required a result supporting coastal restoration rather than protecting otherwise bargained-for rights:

> [T]he implementation of the Caernarvon coastal diversion project fits precisely within the public trust doctrine. ***The public resource at issue is our very coastline, the loss of which is occurring at an alarming rate. The risks involved are not just environmental, but involve the health, safety, and welfare of our people, as coastal erosion removes an important barrier between large populations and ever-threatening hurricanes and storms.*** Left unchecked, it will result in the loss of the very land on which Louisianians reside and work, not to mention the loss of businesses that rely on the coastal region as a transportation infrastructure vital to the region's industry and commerce. The State simply cannot allow coastal erosion to continue….

*Avenal v. State*, 1101-02 (La. 2004), 886 So. 2d 1085, 1101-02 (emphasis added).[65]

## III.    Class Action Certification Is Appropriate for this Matter

These common sets of facts and applicable legal duties are best adjudicated through class action treatment of Bradish Johnson's claims.

### A.    The Applicable Legal Standard

Certification of a class is appropriate when the four prerequisites of Rule 23(a) are satisfied and at least one of the subsections of Rule 23(b). Fed. R. Civ. P. 23. "A district court must conduct a rigorous analysis of the rule 23 prerequisites before certifying a class, but the decision to certify is within the broad discretion of the court as long as that discretion is exercised within the framework of rule 23." *Cleven v. Mid-Am. Apartment Communities, Inc.*, 20 F.4th 171, 176 (5th Cir. 2021) (internal quotation marks, brackets, and citations omitted).

---

[65] Note that, at the time the U.S. Fifth Circuit made its *Erie* guess in *Ryan* in 1987, it did not have the benefit of the Louisiana Supreme Court's decision in *Avenal*.

**B.    The Rule 23(a) Prerequisites Are Satisfied**

Class certification requires plaintiffs to satisfy the four Rule 23(a) elements:

> (1) the class must be "so numerous that joinder of all members is impracticable"; (2) there must be "questions of law or fact common to the class"; (3) the claims or defenses of the representative parties must be "typical of the claims or defenses of the class"; and (4) the representative parties must "fairly and adequately protect the interests of the class."

*Cleven*, 20 F.4th at 175-76 (quoting Fed. R. Civ. P. 23(a)).

**1.    Numerosity**

The numerosity element focuses on the impracticability of joinder, rather than any particular number threshold. *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) ("Although the number of members in a proposed class is not determinative of whether joinder is impracticable, the size of the class in this case—100 to 150 members—is within the range that generally satisfies the numerosity requirement."). While "courts must not focus on sheer numbers alone," classes of between 50 and 160 members have been held to satisfy the numerosity requirement. *See In re TWL Corp.*, 712 F.3d 886, 902 n.4 (5th Cir. 2013) (concurring op., citing cases). Geographic dispersion, in combination with a number of plaintiffs, will meet the impracticability-of-joinder requirement for numerosity. *See, e.g.*, *Reyes v. Julia Place Condos*, 2015 WL 5012930, at *4 (E.D. La. Aug. 20, 2015) (certifying geographically dispersed class of "more than 60" members); *see also Humphrey v. United Way of Tex. Gulf Coast*, 2007 WL 2330933, at *4 (S.D. Tex. Aug. 14, 2007) ("The class size, estimated conservatively at 60 members, makes joinder impractical … sufficiently numerous to satisfy the first prong.").

Here, Dr. Lopez has analyzed the property records along the run of the three pipelines included in the proposed class definition, and concluded that [t]he sum of the lengths of the three Defendants' Pipelines is approximately 280 miles, traversing across more than 290 separately

recorded parcels owned by at least 90 different landowners. The total area of the parcels is in excess of 510,000 acres, including land and open water."[66] Additionally, many of the 290 parcels will each be owned by multiple co-owners, further increasing the number of potential class members. Accordingly, based on both the number of people within the class definition, as well as the geographic dispersion of potential class members, joinder here would be impracticable to the point where the numerosity prerequisite is satisfied.

### 2.    Commonality

The proposed class is united under an overarching common legal question: Does Louisiana law impose a duty on pipeline companies to protect landowners' property burdened by the pipeline companies' servitudes from erosion where their pipelines run through canals that the companies have chosen to leave on the property unfilled? *See, e.g.*, *Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2016) ("Even a single common question of law or fact can suffice to establish commonality, so long as resolution of that question will resolve an issue that is central to the validity of each of the [class members'] claims in one stroke.").

Within this one overarching issue, there are, as demonstrated above, a number of factual and legal questions that are central to every putative class member's claims against the pipeline defendants: whether the pipeline defendants are subject to the duty to obey the law applicable to personal servitudes of right of use in the Civil Code; which of the Civil Code provisions are applicable to the pipeline servitudes; whether those duties include the obligation to protect the canals and the putative class members' property from eroding and to repair erosion damage when it occurs; what the pipeline defendants and their common predecessor-in-interest knew with regard to the need to protect the property from erosion when they choose to leave the canals unfilled;

---

[66] Lopez Aff., at ¶ 4.

what steps the pipeline defendants and their common predecessor-in-interest knew they could take to protect against erosion; whether a common set of remedies driven by the Coastal Master Plan provides the most efficacious remedy for the land loss. These factual and legal issues are at the heart of each putative class member's claims for breach of the servitude duties; for abuse of the rights granted by the servitude instruments; for negligence in performing the servitude obligations; for trespass through the actions in excess of the property rights granted in any servitude; and for nuisance caused by the exercise of servitude rights in excess of those granted to the pipeline defendants. Any one of these factual and legal issues would be sufficient to satisfy the commonality requirement, so this prerequisite is met. *See, e.g.*, *In re SFPP Right-of-Way Claims*, 2017 WL 2378363, at *9 (C.D. Cal. May 23, 2017) ("whether Union Pacific acquired rights in the subsurface, whether Kinder Morgan's pipeline fulfills a railroad purposes, and whether Union Pacific[] knew its rights were limited—are common issues capable of class-wide resolution. These threshold issues must be answered in connection with every class member's claims; therefore, class resolution would generate common answers apt to drive the resolution of the litigation."); *see also Valenzuela v. Union Pac. R.R. Co.*, 2017 WL 679095, at *4 (D. Ariz. Feb. 21, 2017) ("Although it is true that factual variations among parcels and class members will arise, as discussed below, the Court finds that the three questions identified above are subject to proof that will apply to all class members. Commonality is satisfied.").

### 3.    Typicality

The typicality inquiry requires that "the claims or defenses of the representative parties [also be] typical of the claims or defenses of the class. The typicality inquiry rests less on the relative strengths of the named and unnamed plaintiffs' cases than on the similarity of legal and remedial theories behind their claims." *Ibe*, 836 F.3d at 528-29. In analogous ROW trespass class

actions, courts have found typicality met by proof that the named plaintiff owned the property

underlying the servitude or easement. *See, e.g.*, *Koyle v. Level 3 Communications, Inc.*, 2005 WL

8145917, at *1 (D. Idaho Dec. 1, 2005); *Barfield v. Sho-Me Elec. Coop.*, 852 F.3d 795, 806 (8th

Cir. 2017). Even in the face of differing easement language, courts will find that typicality is not

destroyed where either the primary-purpose language of the easement instrument is substantively

similar, any other differences would not appreciably change the analysis of the rights and

obligations under the easement, or those differences that are substantive can be grouped together

into a manageable set of categories of easements. *See Fisher v. Va. Elec. & Pow. Co.*, 217 F.R.D.

201, 224 (E.D. Va. 2003) ("[I]t appears likely that such additional language is also amenable to

categorization and resolution in representative fashion. There is simply no evidence that the over

2000 easements at issue will require 2000 or even 200 individual adjudications. And, in any event,

[w]here the class representative's claims are such that they will have to prove the same elements

as the remainder of the class, then typicality should be found notwithstanding factual differences

between the various members of the class.").

Bradish Johnson is typical of these claims as to each of the three pipelines at issue, because

its property is subject to ROWs for each of the three pipelines, which it argues are subject to the

same obligations to obey the Louisiana law on personal servitudes of right of use, and that failure

to abide by those obligations is the basis for each of the claims as may be raised by all of the

putative class members. As Dr. Lopez has attested that no more than 17% of the waterway

intersections along the three lines have intact erosion control structures,[67] he has also analyzed and

concluded that 19 of the 21 waterway intersections on the Bradish Johnson property lack erosion

control structures one waterway has a protective structure in disrepair, and one has a recently

---

[67] *Id.* at ¶ 11.

rebuilt protective structure.[68] Hence, the modality of damage, causation of damage, and potential remedies faced by Bradish Johnson are typical of those of the entire defined proposed class. *Cf. Schexnayder v. Entergy La., Inc.*, No. 04-CA-636 (La. App. 5 Cir. 3/29/2005), 899 So. 2d 107, 115-16 (under Louisiana's analogous class action statute, finding typicality satisfied in trespass class action under ROW obligations where "all of the proposed representatives' claims arose out of the same course of conduct as the other class members' claims and are based on the same legal theories").

### 4. Adequacy

Adequacy of representation is satisfied by meeting two requirements: (1) the class representative must share common interests with the class members; and (2) class counsel must be qualified to vigorously pursue interests of the class. *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005). The first prong overlaps substantially with the commonality and typicality inquiries, and a class representative's interests will be found not to be sufficiently aligned with absent class members' interests "only if those differences [between the representative and unnamed class members] create conflicts between the named plaintiffs' interests and the class members' interests." *Mullen*, 186 F.3d at 625-26. Here, Bradish Johnson seeks the same suite of Coastal Master Plan-consistent remedies that are appropriate across the whole class, and does not seek any remedy that would be in conflict with the remedies appropriate to other members of the class.[69] And the undersigned counsel have been involved in diligent and zealous representation of landowners in coastal land-loss claims for more than a decade, as well as having served as lead counsel in a number of class actions. This experience will be detailed to the Court's satisfaction at the hearing on this motion.

---

[68] *Id.* at ¶ 13.
[69] *See id.* at ¶ 14; Andrus Aff., at ¶¶ 5-10.

### 5. Other Prerequisites

While not express in federal Rule 23, certification is also subject to at least an implicit ascertainability requirement, where, "in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *In re Deepwater Horizon*, 739 F.3d 790, 821 (5th Cir. 2014). Here, the proposed class definition depends on the objective factor of ownership of property across which one of the three pipelines at issue runs, within a specific set of geographical boundaries. Bradish Johnson's expert has already identified 290 individual property parcels along the pipeline routes within the proposed class area, and membership in the class is objectively ascertainable through a review of recorded property records for those parcels.

### C. Certification is Appropriate under Rule 23(b)

Plaintiff believes that this case should be certified, first and foremost, under Rule 23(b)(2). Plaintiff believes that the Court can and should craft an injunction that imposes upon Defendants the affirmative obligation to bring these ROWs into compliance with the requirements of Louisiana law and to provide for restoration of wetlands property damaged by the Defendants' noncompliance to this point. In addition, or alternatively, the class can and should be compensated in the form of monetary damages, under Rule 23(b)(3). And, finally, it may be appropriate, in accordance with Rule 23(b)(1)(a), for the Court to certify the class in order to prevent the Defendants from being subject to orders establishing incompatible standards of care.

### 1. Certification Is Appropriate Under Rule 23(b)(2)

Rule 23(b)(2) allows for certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P.

23(b)(2); *see also In re Rodriguez*, 695 F.3d 360, 369 (5th Cir. 2012) (affirming 23(b)(2) certification). Here, as detailed above, Tennessee Gas and its successors in interest have acted in a common manner across the defined class area, representing at the outset that it would construct and maintain erosion control measures along the pipeline canals, choosing to leave the canals unfilled, but then determining that it would not continue to maintain the erosion control structures or to repair the landowners' eroded property. The pipeline defendants in common have argued that they do not have any duty to maintain the canals and protect the landowners' property from erosion along the canal routes. Accordingly, declaratory relief as to their obligations as owners of the servitudes, and injunctive relief as to repair of the landowners' wetland property is appropriate.

In *Prantil v. Arkema France,* 2022 WL 1570022 (S.D. Tex. May 18, 2022), for example, the Court certified a class of landowners under Rule 23(b)(2) for appropriate remediation:

> ***The critical predicate of an injunctive class is common behavior by the defendant toward the class, not common effects on the class.*** *See Yates v. Collier,* 868 F.3d 354, 366 (5th Cir. 2017) ("It is well-established that 'instead of requiring common issues, Rule 23(b)(2) requires common behavior by the defendant toward the class'"); *see* 2 William Rubenstein, et al., Newberg on Class Actions § 4:28 (5th ed.) ("While the Rule looks for grounds that 'apply generally' to the class, it is well-settled that the defendant's conduct described in the complaint need not be directed or damaging to every member of the class"). Nonetheless, Arkema's arguments here are primarily directed toward individual differences in the class. Indeed, Arkema puts forth these arguments to attack cohesiveness under Rule 23(b)(2) and predominance under Rule 23(b)(3). Such a "dogged focus on the factual differences among the class members appears to demonstrate a fundamental misunderstanding of Rule 23(b)(2)." *Walters v. Reno,* 145 F.3d 1032, 1047 (9th Cir. 1998). ***This is not a case where each individual class member requires a different injunction. The fact that physical remediation might differ depending on the results of site characterization does not turn a single injunction into a series of individualized ones. All class members seek unified relief in the form of reduced contamination in the class area.*** That Arkema might have to go property by property to facilitate that relief does not change the fact that the relief is directed toward alleviating class-wide exposure…. The Court therefore concludes that the individualized issues identified by Arkema do not defeat cohesion here.

*Id.* at * 41 (emphasis added); *see also, e.g., Baker v. Saint-Gobain Performance Plastics,* 632 F. Supp. 3d 19 (N.D.N.Y. 2022) ("Rule 23(b)(2) does not require that the relief to each member of the class be identical, only that it be beneficial. That means that different class members can benefit differently from an injunction").[70]

With respect to the susceptibility of the defendants to a reasonably specific order, Dr. Lopez and Dr. Andrus have explained that an injunctive remedy can and should be reasonably and specifically crafted in the form of a single, integrated set of restoration and protection methods in alignment with the Louisiana Coastal Master Plan.[71] Both as a matter of law and as a matter of policy, this is preferable to an *ad hoc*, property-by-property set of restoration projects. Dr. Lopez detailed that a common injunctive remedy is supported by the conditions along the lengths of each of the pipeline canals:

> Regarding canal widening, this type of damage can be systematically quantified to determine the areal extent. Given the existing dimensions of the canal (width, depth, and length) compared to the original design and constructed dimensions (direct loss), a calculation can be made to determine the extent of indirect land loss that has occurred. Based on my observations and assessments, the variability of canal dimensions is generally consistent along the pipeline canals, suggesting similar restoration goals and strategies to remedy indirect loss due to canal widening may applied where the canal currently exists.[72]

---

[70] In addition, while initially certified, over Murphy Oil's objection, as a (b)(3) class, the ultimate class settlement included a Remediation Plan. *Turner v. Murphy Oil,* 472 F.Supp.2d 830, 839 (E.D. La. 2007).

[71] *See, e.g., Prantil*, 2022 WL 1570022, at *38 ("'Rule 23(b)(2) does not require that every jot and tittle of injunctive relief be spelled out at the class certification stage,' but some 'reasonable detail' as to the 'acts required' is necessary.' 986 F.3d at 581. Through Mr. Glass, Plaintiffs provide reasonable detail as to the acts required of Arkema. At this stage, Plaintiffs need not set out which sample they are going to take on which day. What's more, while Arkema might disagree with Plaintiffs' proposed remediation levels, Plaintiffs have specified reasonable standards by which remediation might be assessed. Those standards are rooted in carcinogenic risk factors. Other states have used those standards as remediation goals. And these standards can evolve over time. Plaintiffs are not locked into the standards that they suggest today. In *Yates,* the Fifth Circuit affirmed this Court's certification order even though it "did not specify the precise temperature" that needed to be reached to alleviate the harm to the plaintiffs. That requested injunction contained sufficient "meaningful content" and "guidance." So, too, here. Plaintiffs have "'given content' to the injunctive relief they seek 'so that final injunctive relief may be crafted to describe in reasonable detail the acts required.'").

[72] Lopez Aff., at ¶ 14.

Dr. Lopez further concludes that a unitary restoration plan for the wetland areas along the entire runs of the pipeline canals at issue will be a superior form of remediation, because the wetlands system operates as a single ecosystem: "Science recognizes the interconnectedness of the deltaic coast through hydrology, sedimentary processes, and estuarine biology and discourages parochial or siloed restoration planning."[73]

Accordingly, because the claims here depend on the Defendants' conduct taken in common toward all landowners across whose property the pipeline canals run, based on Defendants' common knowledge of what would happen if they exercised their accessory rights of leaving unfilled canals without diligent protection and repair efforts, and because a common injunctive remedy is the appropriate redress to this course of conduct, certification under Rule 23(b)(2) is the appropriate action.

## 2.    Certification Under Rule 23(b)(3) Is Additionally or Alternatively Appropriate

Rule 23(b)(3) allows certification where "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "From this rule, courts have reduced the analysis to two inquiries: predominance and superiority." *Chavez v. Plan Benefit Servs., Inc.*, 77 F.4th 370, 389 (5th Cir. 2023).

In *Chavez v. Plan Benefit Services, Inc.*, the Court held that "whether [the defendant] owed a duty to Plaintiffs was a common question across the class" and "that whether that duty was breached was a similarly common question that was significant and likely dispositive over the entire class's claims." *Id.* Litigation of this common question in individual litigations, the Court

---

[73] *Id.*

held, "would inevitably lead to the redundant production of evidence that is common across the class." *Id.* at 389-90. The Court held, therefore, that the predominance element was met for (b)(3) certification. Similarly, here, the primary, predominant question is whether the pipeline defendants owe each of the class members a common duty to obey the law applicable under the Civil Code to all personal servitudes of right of use, and if a failure to protect landowners' property from erosion damage is a breach of that duty. Similarly, the Defendants' conduct as to the property owners along all of the pipeline routes is susceptible to common proof and would result in redundant discovery and production of evidence and testimony. As in *Chavez*, therefore, here predominance should be found to be met. *See In re Deepwater Horizon*, 910 F. Supp. 2d 891, 912 (E.D. La. 2012) ("This is a matter of weighing, not counting, issues."), *aff'd*, 739 F.3d 790 (5th Cir. 2014).

The legal issues and the factual background detailed above demonstrates the predominance of the common legal and factual issues. *See Tyson Foods, Inc. v. Bousphakeo*, 577 U.S. 442, 453 (2016); *see also Barfield*, 852 F.3d at 806 (holding that individualized easement provisions and damages questions did not prevent the larger issue of duty owed to property owners subject to the easements from being the predominant issue for 23(b)(3) certification purposes); *see also Torres v. SGE Mgt., LLC*, 838 F.3d 629, 645-46 (5th Cir. 2016) (*en banc*) (rejecting argument that potential alternative causation of individual class members' damages destroyed predominance); *Fisher*, 217 F.R.D. at 226 (certifying ROW trespass class action under 23(b)(3)); *cf. Rivera v. United Gas Pipeline Co.*, 613 So. 2d 1152, 1155 (La. App. 5th Cir. 1993) (certifying class under analogous state law for class of property owners damaged by pipeline rupture because "the essence of the causes of action is that the defendants conducted activities on the gas line in their care, custody and control in such a manner that it caused" the damages at issue).

This is not a "sprawling" mass tort class action, where multiple defendants, choice of law issues, or individual issues of assumption of risk, comparative fault, differing conduct, reliance, or damages might render certification inappropriate or incomplete.[74] Dr. Lopez recognizes that a unitary formulaic calculation can be applied to the value of redressing land-loss along the entire pipeline routes:

> Indirect land loss, resulting from Defendants' pipeline operations, can be characterized into two main categories—canal widening (inside the canal banks) and land loss occurring surrounding and adjacent to the canal (outside the canal banks). Regarding canal widening, this type of damage can be systematically quantified to determine the areal extent. Given the existing dimensions of the canal (width, depth, and length) compared to the original design and constructed dimensions (direct loss), a calculation can be made to determine the extent of indirect land loss that has occurred.[75]

Dr. Andrus's analysis confirms this: "Using the Project Costing Tool Validation Study as a baseline, formulaic pricing models can be developed to cost out engineering, data gathering, and construction costs that could be consistently applied to all project components."[76] Dr. Andrus also highlights the "economic advantages" to a "programmatic restoration approach,"[77] which further illustrates the superiority of the class approach to the damages caused by the Defendants' conduct.[78]

As set forth by Bradish Johnson's experts, the calculation of damages will not require the introduction of new and substantial legal or factual issues, nor entail complex individualized determinations, nor require additional hearings to resolve the disparate merits of each individual class member's case; rather, such damages are capable of computation by means of objective

---

[74] *Cf. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997); *Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996).
[75] Lopez Aff., at ¶ 14.
[76] Andrus Aff., at ¶ 10.
[77] *Id.* at ¶ 9.
[78] *See e.g.*, *Deepwater Horizon*, 910 F. Supp. 2d at 907 (approving (b)(3) certification of a "Wetlands Framework" awarding damages to landowners according to a per-acre formula), *aff'd*, 739 F.3d at 815-817.

standards, and are not dependent in any significant way on the intangible, subjective differences of each class member's circumstances. *Cf. Allison*, 151 F.3d at 415; *see also, e.g.*, *In re Chinese Drywall*, 2017 WL 1421627 (E.D. La. Apr. 21, 2017) (referencing the Knauf Class Settlement Agreement, dated December 20, 2011, R. Doc. 12061-5, approving class settlement for remediation of affected properties under Rule 23(b)(3), and establishing a Taishan Class aggregate remediation damages award), and 2014 WL 4809520, at *15 (E.D. La. Sept. 26, 2014) ("the Court has already found that the costs of remediation can be calculated on a square footage basis"); *Jackson v. Unocal Corp.*, 262 P.3d 874, 889-890 (Colo. 2011) (certifying an "easement property class" for 66 owners of properties and a "contiguous property class" for 235 properties contiguous to those easement properties, for land damages against an oil company arising from the release of asbestos during removal of an underground oil pipeline).

### 3.    Certification Under Rule 23(b)(1)(a) May Also Be Appropriate

Rule 23(b)(1) provides for certification of a class when

… prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards or conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests[.]

Fed. R. Civ. P. 23(b)(1).

"Rule 23(b)(1)(A) takes in cases where the party is obliged by law to treat the members of the class alike …, or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)." *Amchem Prods.*, 521 U.S. at 614. Here, if the putative class members each pursued their claims individually, there could be varying

adjudications as to the obligations owed by the pipeline companies under the Louisiana Civil Code's suppletive rules, which would result in different, and potentially inconsistent, remedies on portions of the line distinguished only by the essentially arbitrary (for purposes of canal functionality and the impacts on the hydrology and the marsh) location of property boundaries.

As the pipeline companies' own documents show, they have always treated the pipelines and their canals as a system, with one overall budget for canal maintenance, integrated programs of inspection, all arising from a unitary, "going in" plan of construction and maintenance. Where varying adjudications could cause TGP and Kinetica to be subject to different sets of business practices with regard to maintenance of their ROWs, certification under 23(b)(1)(A) would be appropriate. *See Smith v. Crystian*, 91 Fed. Appx. 952, 954-55 (5th Cir. 2004) ("In the instant case, numerous claims have already been filed or are expected to be filed against Tower and each has requested or probably will request injunctive relief seeking to modify Tower's business practices. … If similar relief is requested in another proceeding, a risk of incompatible standards of conduct could present itself if the two courts establish conflicting 'fair methods' for filing credit insurance claims."). Accordingly, certification under Rule 23(b)(1)(A) would protect the pipeline Defendants from multiple inconsistent adjudications.

## IV.    Conclusion

For these reasons, to be substantiated and further detailed at a hearing on this Motion, Bradish Johnson requests that this Court certify this action as a class action, approve Bradish Johnson as the class representative, and appoint the undersigned as class counsel.

Respectfully submitted,

*/s/ E. Blair Schilling*

James R. Swanson (#18455)
(jswanson@fishmanhaygood.com)
Stephen J. Herman (#23129)

(sherman@fishmanhaygood.com)
Kerry J. Miller (#24562)
(kmiller@fishmanhaygood.com)
H.S. Bartlett III (#26795)
(tbartlett@fishmanhaygood.com)
Lance C. McCardle (#29971)
(lmccardle@fishmanhaygood.com)
E. Blair Schilling (#35308)
(bschilling@fishmanhaygood.com)
Julie S. Meaders (#39984)
jmeaders@fishmanhaygood.com
Isabel A. Englehart (LA Bar No. 40354)
ienglehart@fishmanhaygood.com
201 St. Charles Avenue, Suite 4600
New Orleans, LA  70170
Telephone:    (504) 586-5252
Facsimile:    (504) 586-5250

Gladstone N. Jones, III (LA Bar No. 22221)
(gjones@jonesswanson.com)
Michael P. Arata (LA Bar No. 21448)
(marata@jonesswanson.com)
Kevin E. Huddell (LA Bar No. 26930)
(khuddell@jonesswanson.com)
John T. Arnold (LA Bar No. 31601)
(jarnold@jonesswanson.com)
JONES SWANSON HUDDELL, L.L.C.
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Facsimile: (504) 523-2508

S. Jacob Braud (LA Bar No. 28318)
(Jacob@NolaAttomeys.com)
BALLAY, BRAUD & COLON, PLC
81 1 4 Highway 23, Suite 101
Belle Chasse, Louisiana 70037
Telephone: (504) 394-9841
Facsimile: (504) 394-9945

A.M. "Tony" Clayton (LA Bar No. 1191)
Ulysses Gene Thibodeaux (LA Bar. No. 12737)
D'Ann R. Penner (LA Bar No. 35545)
(dpenner@claytonfrugelaw.com)
CLAYTON, FRUGÉ, WARD & HENDRY
3741 La. Highway 1 South

40

Port Allen, Louisiana 70767
Telephone: (225)344-7000
Facsimile: (225) 383-7631

T. Taylor Townsend (LA Bar No. 20021)
T. TAYLOR TOWNSEND, LLC
320 Saint Denis Street
Natchitoches, LA 71457
Telephone: (318) 238-3612
Facsimile: (318) 238-6103

***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 12th day of July, 2024, I electronically filed the foregoing pleading using the CM/ECF System, which will send notice of the electronic filing to all counsel of record.

*/s/ E. Blair Schilling*

3892898v1